DOMTAR, INC., Appellant (C9–
95–2673), Respondent (C0–
95–2626, C7–95–2638),

v.

NIAGARA FIRE INSURANCE COMPA-
NY, et al., Appellants (C7–95–2638), Re-
spondents (C0–95–2626, C9–95–2673),

Canadian General Insurance Company,
et al., Respondents,

Certain Underwriters at Lloyd's of Lon-
don, et al., Appellants (C0–95–2626), Re-
spondents (C7–95–2638, C9–95–2673).

Nos. C0–95–2626, C7–95–2638
and C9–95–2673.

Supreme Court of Minnesota.

May 29, 1997.

Briggs & Morgan, Douglas L. Skor & Scott G. Knudson, St. Paul, Zevnik Horton Guibord & McGovern LLP, Paul Anton Zevnik & John Osborne, Washington, DC, for Appellant/Respondent Domtar, Inc.

Moore, Costello & Hart, Larry Hanson, St. Paul, for Respondent Canadian General Ins. Co. & Scottish and York Ins. Corp., Ltd.

Arthur, Chapman, McDonough, Kettering & Smetak P.A., Thomas A. Pearson, Minne-

apolis, for Appellants/Respondents Niagara Fire Ins. Co. & Continental Ins. Co.

Oppenheimer Wolff & Donnelly, Thomas P. Kane & Kenneth H. Podpeskar, St. Paul, Lord, Bissel & Brook, Gary W. Westerberg & Joseph A. Hinkhouse, Chicago, IL, for Respondents/Appellants Certain Underwriters at Lloyd's of London & World Auxiliary Ins. Co.

Hubert H. Humphrey, III, Attorney General, John K. Lampe, Assistant Attorney General, St. Paul, for amicus curiae State.

Bassford, Lockhart, Truesdell & Briggs, P.A., Charles E. Lundberg, Mineapolis, Wiley, Rein & Fielding, Laura A. Foggan, Lon A. Berk & Luis de la Torre, Washington, DC, for amicus curiae Insurance Environmental Litigation Ass'n.

Austin & Abrams, P.A., Jerome B. Abrams, Fredrikson & Byron, Thomas Fraser & Richard Snyder, Minneapolis, for amicus curiae Certain · Insurers of Minnesota Mining & Manufacturing Co.

Zelle & Larson, LLP, Dale I. Larson, James S. Reece & Sandra Wallace, Maslon Edelman Borman & Brand, Gary J. Haugen, David F. Herr & R. Lawrence Purdy, Minneapolis, for amicus curiae Minnesota Mining & Manufacturing Co.

## OPINION

KEITH, Chief Justice.

This case presents several issues regarding the scope of comprehensive general liability insurance for environmental contamination. Domtar, Inc. initiated this action against fifteen insurers in 1991, seeking: (1) a declaration that its insurers are obligated to indemnify Domtar for environmental damage arising from Domtar's operation of a tar refining plant at the St. Louis River/Interlake/Duluth Tar Site ("the Site"); (2) a decla-

ration that its insurers have a duty to defend Domtar against demands for response action and damages claims from the Minnesota Pollution Control Agency; (3) breach-of-contract damages for the insurers' refusals to defend; and (4) litigation costs incurred in this action. The case proceeded to trial against four defendants who insured Domtar from 1956 through 1970: Continental Insurance Co. and Niagara Fire Insurance Co. (collectively "Continental") as primary insurers, and Certain Underwriters at Lloyd's of London and World Auxiliary Insurance Co. Ltd. (collectively "Lloyd's") as excess insurers.[1]

The trial court concluded that: (1) clean-up costs should be allocated evenly from the inception of the environmental damage to the inception of clean-up efforts and that each insurer was liable only for the damage during those years in which its policies were on the risk; (2) Continental was liable for $1,154,318.50 for breaching its duty to defend Domtar ("defense costs"); and (3) Continental was liable for $1,663,674.25 in attorney fees and expenses incurred by Domtar in this action ("litigation costs"). The court of appeals affirmed. *Domtar, Inc. v. Niagara Fire Ins. Co.*, 552 N.W.2d 738, 742 (Minn. App.1996) (*"Domtar II"*). Domtar, Continental, and Lloyd's all petitioned for further review. We affirm the trial court's rulings, except with respect to the award of defense costs incurred before Domtar tendered a defense request to its insurers.

## I.

### Facts and Procedural History

Domtar owned and operated a tar refining plant on the north bank of the St. Louis River in Duluth during the first half of this century. The Site in question encompasses about 230 acres of land and river embayment. Domtar operated its plant on 5 to 6 acres of the Site from 1924 to 1929 and from 1934 to 1948, when the plant closed. The plant was dismantled in 1954 or 1955 and the

---

1. Domtar's dispute with Canadian General Insurance Co. ("Canadian General") is not now before this court. Canadian General was a named defendant at the time of trial, but personal jurisdiction over the company was still in dispute and its liability was therefore not deter-

mined. Personal jurisdiction was upheld by this court four months after the verdict. *Domtar, Inc. v. Niagara Fire Ins. Co.*, 533 N.W.2d 25, 34–35 (Minn.), *cert. denied,* —— U.S. ——, 116 S.Ct. 583, 133 L.Ed.2d 504 (1995) (*"Domtar I"*).

property was sold to Morton Salt Co. in 1955. An automobile salvage yard now occupies the property. Pollution was detected at the river embayment in 1979, and the entire 230–acre area is now a Superfund site.

In 1987, the Minnesota Pollution Control Agency ("MPCA") began a remedial investigation of the Site. That investigation revealed that hazardous substances had been released into the soil and groundwater. On November 28, 1990, the MPCA sent notice to Domtar that it had been identified as a responsible party. The MPCA determined that further investigation and evaluation of the contamination at the Site were necessary and, on March 26, 1991, the agency issued a Request For Response Action ("RFRA") to Domtar and two other responsible parties.

The 1991 RFRA requested response action in two areas of the Site: the "Tar Seeps Unit" and the "Soils Operable Unit." Domtar estimated that its liability for clean-up at these two units would be $7 million. At the time of trial, the MPCA had not yet determined a suitable remediation program for these two units, nor had it requested response action from Domtar for a third unit at the Site, the "Sediments Operable Unit," an area that includes the river embayment. The MPCA had estimated that clean-up costs at the Sediments Operable Unit would total $200–$300 million. According to the parties, the MPCA reversed its position and issued an RFRA to Domtar for the Sediments Operable Unit on March 26, 1996.

According to testimony at trial, the MPCA clean-up plan is likely to require removal of contaminants from the soil as well as continuous monitoring of the groundwater to ensure that soil remediation provides adequate protection. One purpose of soil remediation at the Site is to protect the groundwater, although the MPCA had not ordered Domtar to remove chemicals from the groundwater at the time of trial. Testing indicates that the groundwater has been contaminated with carcinogenic coal tar derivatives.

After receiving notice from the MPCA, Domtar searched its records and identified potentially liable insurers. On July 2, 1991, Domtar first notified Continental and Lloyd's of the MPCA action and demanded that the insurers defend Domtar against the MPCA's response requests, investigate Domtar's portion of the Site, and pay for clean-up costs. Eight days later, on July 10, 1991, Domtar filed this action against various insurers, including Continental and Lloyd's. Continental and Lloyd's subsequently denied coverage and refused to defend.

The case was tried before a Ramsey County jury in early 1995. Domtar did not attempt to prove coverage before 1956 (because the policies were lost) or after 1970 (because those insurers were dismissed by Domtar before trial, and such evidence was ruled inadmissible).[2] Domtar did produce evidence of insurance from 1956 to 1970 ranging from $2.1 to $10.0 million of property-damage coverage per year.[3]

Precisely how Domtar contributed to pollution at the Site, and when environmental damage took place, were contested issues at trial. The record discloses two general causes of Domtar's share of the contamination. First, expert opinion and direct evidence indicated that routine waste-handling practices and accidental spills and leaks at the plant were sources of the pollution. For example, Lloyd's expert asserted that one storage tank or its pipes—last used prior to 1933—leaked and contaminated the soil and groundwater. There was also testimony that waste (e.g., liquid spills and solid materials such as ash, "clinker" from the boiler, and waste tar paper) was buried in or spread on the soil during the plant's operation. Second, Domtar's expert pointed to the decommissioning process as the primary cause of the pollution. In his opinion, the bulk of the damage arose from discharges when storage tanks were dismantled before the property was sold in 1955. A 1948 inventory indicated that 50,000 gallons of "sludge or residual muck" were left in Domtar's tanks at the

---

2. Domtar acknowledges that its 1971–1986 policies contained exclusions for pollution discharges that are not "sudden and accidental."

3. Lloyd's excess policies state that their limits are expressed in Canadian Dollars. · The other policies at issue are ambiguous on this question. The record does not resolve the issue.

time operations ceased. When the property was sold in 1955, a tank base was left in the ground and a two-to-three-foot layer of coal tar derivatives was subsequently found at that location. An area including that tank base is now the Tar Seeps Operable Unit.

There was some agreement that the contamination could not be apportioned among causes. Domtar's expert concluded that the damage was continuous and indivisible, and Lloyd's expert conceded that leakage to the groundwater from the abandoned tank base had become commingled with and inseparable from other migrating contaminants. There was no dispute that all of the pollution from the plant was discharged before Domtar sold the property and before Domtar purchased insurance from the defendants.

The experts disagreed, however, on the extent of additional environmental damage after the plant was decommissioned. Domtar's expert testified that the contaminants were migrating deeper into the soil and through the groundwater during the ensuing years, including the present time. Although he did not estimate the degree of that migration, Domtar's expert concluded that the "property damage at the site was indivisible and that it continued and expanded" over the years. Continental took issue with this testimony; its expert claimed that certain carcinogenic components of the coal tar in the soil probably moved less than 1.2 inches in the 70 years since discharge. With regard to groundwater contamination, in contrast, the defendants' experts surmised that liquid coal tar materials rapidly seeped through cracks in a subsurface layer of clay during tar plant operations. Continental's expert asserted that most of the contaminated soil had not affected the groundwater; he noted that only two areas of soil contamination, amounting to 2,600 cubic yards, have been associated with groundwater contamination at this time. Lloyd's expert also argued that, if anything, the contamination has been ameliorated by biodegradation in the ensuing years.

On February 7, 1995, the jury returned a verdict in favor of Domtar. First, the jury found that Continental breached its duty to defend, entitling Domtar to $1,154,318.50 in defense costs. Second, the jury found that "some * * * property damage * * * commenced" at the Site in 1933 and that "some" property damage took place during the following time periods:

| Some Damage Took Place | Insurer | Type of Insurance |
|---|---|---|
| Oct. 1, 1956–Jan. 1, 1960 | Lloyd's 4 | Excess |
| Jan. 1, 1960–Feb. 18, 1965 | Lloyd's | Excess |
| Feb. 18, 1965–Dec. 31, 1967 | Continental | Primary |
| Dec. 31, 1967–Dec. 31, 1970 | Continental | Primary |

Third, the jury concluded that the defendants failed to demonstrate that no "appreciable" damage took place during their policy periods. Finally, the jury concluded that Continental failed to demonstrate that Domtar "acted or failed to act with the intent to cause injury to property."

Based on the verdict and the proceedings, the trial court then issued three rulings relevant to this appeal. First, the court followed the jury's verdict and entered judgment in the amount of $1,154,318.50 against Continental for breaching its duty to defend Domtar. Second, the court awarded Domtar $1,683,361.20 against Continental in litigation costs that Domtar incurred in prosecuting this action. Later, that award was reduced by $19,686.95 in order to eliminate costs incurred before Domtar tendered a defense request to its insurers. The award of defense costs, however, was not likewise reduced. Third, the court invoked *Northern States Power Co. v. Fidelity & Cas. Co. of New York,* 523 N.W.2d 657, 664 (Minn.1994) (*"NSP"*), and held that any soil remediation costs incurred by Domtar at the behest of the MPCA should be allocated evenly from 1933 (when damage began) to the year in which clean-up efforts begin. The trial court's formula absolved the defendants of liability for costs allocated outside of their policy periods; Domtar would bear the costs allocated to the years before 1956 and after 1970.

Domtar appealed the trial court's cost-allocation ruling, and Continental and Lloyd's challenged the rulings concerning coverage, defense costs, and litigation costs. The court of appeals consolidated the appeals and af-

4. Apparently, Canadian General was Domtar's primary insurer from 1956 to 1965. Lloyd's was also Domtar's excess insurer from 1966 to 1969.

firmed in all respects. *Domtar II*, 552 N.W.2d at 742.

## II.

### The Policy Language

From 1956 through 1970, Domtar obtained comprehensive general liability ("CGL") insurance for liability arising from damage to property.

The policies in effect from 1965 to 1970 cover "occurrences" during the policy period. Continental's primary insurance policy for the period February 18, 1965 to December 31, 1967 promises "[t]o pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of tangible property, including loss of use." The policy-period/territory provision states, "This policy applies * * * to occurrences during the policy period anywhere in the world * * *." The limit of Continental's liability "for all damages arising out of injury to or destruction of property, including loss of use" is limited to $5 million per year "as the result of any one occurrence." Continental's policy for the period December 31, 1968 to December 31, 1970 is substantially similar, although it explicitly includes "accidents" within its coverage: the policy applies to "accidents or occurrences during the policy period anywhere in the world," and notes that "when not caused by accident, the injury or destruction must be to tangible property." Continental's policies do not define the terms "occurrence" or "accident." Lloyd's excess policy for the period March 7, 1966 to March 7, 1969 is also "occurrence"-based coverage. The underwriters of the policy agreed "to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability * * * imposed upon the Assured by law, * * * for damages * * * on account of * * * Property Damage * * * caused by or arising out of each occurrence happening anywhere in the world." In this policy, "occurrence" is defined: it means "an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in * * * property damage * * * during the policy period. All such exposure to sub-stantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence."

The policies in effect from 1956 to 1965 cover "accidents" during the policy period, although that term is defined in broad fashion. Lloyd's excess policy for the period February 18, 1962 to February 18, 1965 promises coverage for "all sums which the Assured shall become legally obligated to pay, or by final judgment be adjudged to pay, to any person or persons as damages * * * for damage to or destruction of property of others, including the loss of use thereof * * * caused by accident occurring during the [policy period] * * * and which are also covered by and defined" in the Canadian General primary policies. "Accident" is defined as "an accident or series of accidents arising out of one event or occurrence." An endorsement also states, "This Policy applies to events occurring anywhere in the world * * *." The standard-form policy introduced as circumstantial evidence of coverage for the period October 1, 1956 to February 18, 1962 is substantially similar, and its definition of "accident" is the same. The underlying Canadian General primary policies for this period are also "accident"-based, according to the evidence of coverage produced at trial. Domtar's coverage dispute with Canadian General was not resolved in the proceedings below.

## III.

### Trigger of Coverage, Scope of Coverage, and Allocation of Losses

Domtar argues that the lower courts improperly allocated losses to years in which Domtar did not demonstrate that it was insured. Domtar contends that losses can be allocated only to the 15 years of triggered insurance coverage, not across the 64 years from the time that damage first occurred until the initiation of remediation. Under Domtar's reading of *NSP*, 523 N.W.2d at 662–64, this court has established rules only for "triggering" CGL policies and for "allocating" liability among triggered policies, but not for the "scope of coverage." Domtar believes that each of its 1956–1970 CGL in-

surers is liable for the entire loss occasioned by the MPCA action because the policies promise to pay "all sums" for which the insured becomes legally obligated. Remedial expenditures mandated by the MPCA may properly fall within the definition of damages because of property damage in CGL policies. *See Minnesota Mining & Mfg. Co. v. Travelers Indem. Co.*, 457 N.W.2d 175, 184 (Minn. 1990) ("*3M* ").

For the purposes of addressing this issue, the defendants do not disagree that their policies have been triggered, or that *NSP* offers the best method of allocating damages among the various insurance policies that have been triggered. Rather, the defendants argue that the language and logic of *NSP* dictate that Domtar bear the costs of remediation allocated to the years outside of their policy periods. Further, the defendants claim that, by their terms, the policies at issue do not respond to any damages that occur outside of the policy period.

Based on the facts of this case, *NSP* is the starting point for analyzing whether Domtar is responsible for self-insured periods. Like Domtar, the insured in *NSP* was prompted by the MPCA to respond to environmental contamination. *NSP*, 523 N.W.2d at 658–59. The contamination arose from NSP's operation of two coal-tar gasification facilities; operations ceased sometime after 1933, the entire property was sold by 1978, and NSP sought coverage from its 1946–1985 insurers. *Id.* On appeal, we considered allocation and related issues with respect to NSP's 1958–1973 CGL insurer. *Id.* at 659–60. Like the CGL policies in this case, the policies at issue in *NSP* covered occurrences "during the policy period," but also promised to pay "all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of" property. *Id.* at 659. The policy limits applied to "each occurrence or series of occurrences arising out of one event." *Id.*

Domtar believes that *NSP* did not indicate whether an insured is liable for self-insured periods, but its reading of our decision is too narrow. *NSP* made three rulings relevant to continuous and indivisible environmental contamination cases: (1) we established a guiding principle for triggering standard CGL policies—a policy is triggered if property damage occurred during the policy period; (2) we indicated that, in such cases, an insurer's liability is limited to property damage occurring during its policy period or periods—insurers become consecutively liable rather than concurrently liable; and (3) we recommended a fair method for allocating losses among CGL insurers who are consecutively liable for continuing property damage, in the absence of applicable policy language—pro rata by time on the risk. *Id.* at 662–64. In these cases, the insured bears the burden of proving that a policy has been triggered, but if the insured proves when the contamination began and when it ended or was discovered, then the trial court should presume that property damage was continuous from its initiation until the time of cleanup or discovery. *Id.* at 662–63. The burden of proof then shifts to any party seeking to demonstrate that no appreciable damage occurred during a particular time period. *Id.* All policies in effect when damages occurred are triggered, and liability is allocated to each policy according to the proportion of time each was on the risk. *Id.* at 664.

We did not use the label "scope of coverage" in *NSP*, but the substance of the opinion is clear enough. When the origins of environmental contamination are uncertain or indivisible and the property damage is continuous, insurers are consecutively, not concurrently, liable. *Id.* at 662–63. We also explained that soil and groundwater contamination "should be regarded as a continuous process in which the property damage is evenly distributed over the period of time from the first contamination to the end of the last triggered policy (or *self-insured* ) period." *Id.* at 664 (emphasis added). In fact, we rejected the very same "all sums" policy language argument advanced by Domtar in this case, concluding that a pro-rata-by-policy-limits allocation method would violate the spirit of the actual-injury trigger theory in continuous environmental damages cases. *Id.* at 662. Each insurer is liable for that period of time it was on the risk compared to the *entire* period during which damages occurred. It was not error for the trial court

to limit the defendants' liability to damages occurring during their policy periods.[5]

■ Domtar further argues that there is an evidentiary difficulty with allocating damages to self-insured periods because the jury was not asked to determine whether there was "some damage" before 1956 or after 1970. The jury concluded that property damage commenced in 1933 and nothing in the record supports the conclusion that it abruptly discontinued at any point before 1956 or after 1970. To the contrary, Domtar's own expert testified that his opinion as to continuing damage was the same for years after 1970. Any party believing that no appreciable damage occurred during a particular time period bears the burden of proving that fact. *See id.* at 664. The factual presumption of continuous damage cannot be amended solely to benefit the insured.

■ It should also be clear, however, that the defendants' reading of *NSP* is too broad. It is inaccurate to conclude that a CGL insurer is *never* liable for damages occurring outside of the policy period. CGL policies come in many forms and it is a mistake to read our case law as if the scope of coverage has been resolved for all such policies, no matter what their language. The proper scope of coverage also will depend on the facts of the case. When environmental contamination arises from discrete and identifiable events, then the actual-injury trigger theory allows those policies on the risk at the point of initial contamination to pay for all property damage that follows. *See SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 318 (Minn.1995) (despite continuing damage from leaching of chemicals into the groundwater after the policy period, only the primary and excess policies on the risk at the time of the discharge were triggered, but those policies responded to the entire loss). This interpretation of the policies is in accord with the common understanding of the terms "occurrence" or "accident." It is only in those difficult cases in which property damage is both continuous and so intermingled as to be practically indivisible that *NSP* properly applies. *NSP* provides a judicially manageable way for trial courts to adjudicate certain pollution-coverage disputes when it is difficult to determine when an "event" or "occurrence" or "damage" giving rise to legal liability has occurred. *NSP* does not establish hard-and-fast rules; it offers a practical solution in the

---

5. *Cf. Jostens, Inc. v. CNA Ins./Continental Cas. Co.*, 403 N.W.2d 625, 630 (Minn.1987) (denying coverage for employment discrimination damages incurred after the end of the policy period when a class action settlement formula assumed that the damages to each class member corresponded to the period of employment with Jostens; the policy limited coverage to personal injury taking place during the policy period); *Singsaas v. Diederich*, 307 Minn. 153, 155–56, 238 N.W.2d 878, 880 (1976) (denying coverage when the injury took place after the policy was cancelled by the insured; although the negligent act took place before cancellation, the policy was limited to occurrences that result, during the policy period, in bodily injury).

Domtar cites cases that allow "all sums" recovery without reduction for self-insured years, but these cases do not adopt a pro-rata allocation formula. *See Dayton Indep. Sch. Dist. v. National Gypsum Co.*, 682 F.Supp. 1403, 1410–11 (E.D.Tex.1988); *Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.*, 45 Cal.App.4th 1, 105–06, 52 Cal.Rptr.2d 690, 742–43 (Cal.Ct.App.), *rev. denied* (Cal. Aug. 21, 1996); *Monsanto Co. v. C.E. Heath Compensation & Liab. Ins. Co.*, 652 A.2d 30, 35 (Del.1994) (interpreting Missouri law); *J.H. France Refractories Co. v. Allstate Ins. Co.*, 534 Pa. 29, 41, 626 A.2d 502, 508–09 (1993);

*American Nat'l Fire Ins. Co. v. B & L Trucking & Constr. Co.*, 82 Wash.App. 646, 664–66, 920 P.2d 192, 201 (1996); *see also ACandS, Inc. v. Aetna Cas. & Sur. Co.*, 764 F.2d 968, 974 (3d Cir.1985); *Keene Corp. v. Insurance Co. of N. Am.*, 667 F.2d 1034, 1048–50 (D.C.Cir.1981).

In pro-rata jurisdictions, many courts follow the insurers' view and allocate losses to self-insured periods. *See Stonewall Ins. Co. v. Asbestos Claims Management Corp.*, 73 F.3d 1178, 1203–04 (2d Cir.1995); *Commercial Union Ins. Co. v. Sepco Corp.*, 918 F.2d 920, 924 (11th Cir.1990) (addressing liability for defense costs in view of a statute regarding insolvent insurers); *Insurance Co. of N. Am. v. Forty–Eight Insulations, Inc.*, 633 F.2d 1212, 1224 (6th Cir.1980) (addressing liability for defense costs), *clarified*, 657 F.2d 814, *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.*, 662 F.Supp. 71, 76 (E.D.Mich.1987) (addressing liability for defense costs); *IMCERA Group, Inc. v. Liberty Mut. Ins. Co.*, 47 Cal.App.4th 699, 739–40, 50 Cal.Rptr.2d 583, 607 (1996), *rev. granted*, 54 Cal. Rptr.2d 41, 917 P.2d 1164 (1996); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 283 Ill. App.3d 630, 641–42, 219 Ill.Dec. 62, 69–70, 670 N.E.2d 740, 748–49 (1996); *Owens–Illinois, Inc. v. United Ins. Co.*, 138 N.J. 437, 465–66, 479, 650 A.2d 974, 988–89, 995 (1994).

face of uncertainty. *NSP*, 523 N.W.2d at 663, 665.

## IV.

### Coverage Defenses

#### A.

Although the MPCA has not yet decided the particular remedies appropriate for clean-up at the Site, the defendants contend that at least some remediation will take place on and solely to benefit the property where Domtar operated its tar refining plant. The CGL policies introduced at trial exclude claims for damage to property owned by the insured, and the defendants assert that it was error not to present this coverage defense to the jury. Drafting special verdict forms is a matter within a trial court's sound discretion. However, a party is entitled to have the jury consider important questions of material fact raised by the pleadings and the evidence. Minn. R. Civ. P. 49.01(a); *Hill v. Okay Constr. Co.*, 312 Minn. 324, 340, 252 N.W.2d 107, 118 (1977); *see also Thielbar v. Juenke*, 291 Minn. 129, 136, 189 N.W.2d 493, 498 (1971).

We have indicated that the owned-property exclusion can limit recovery for MPCA-prompted remediation expenses. *NSP*, 523 N.W.2d at 662 n. 6. Domtar is correct, however, that groundwater contamination is damage to public property and therefore not excluded. *3M*, 457 N.W.2d at 182. Moreover, we agree that if there is actual injury and an existing threat to third-party property (whether private or public), then clean-up on the insured's own property that is designed to protect third-party property is not excluded. *Cf. State v. Signo Trading Int'l, Inc.*, 130 N.J. 51, 61–64, 612 A.2d 932, 937–39 (1992) (adopting this standard, but requiring an "imminent" threat). Nevertheless, the owned-property exclusion does bar coverage for expenses incurred to clean-up contamination that is confined to the insured's property and unrelated to preventing off-site contamination.

We agree with the lower courts, however, that the owned-property exclusion does not apply in this case. Domtar simply did not own the property at the time that the defendants' insurance policies were in effect. *See Hatco Corp. v. W.R. Grace & Co.-Conn.*, 801 F.Supp. 1334, 1359 (D.N.J.1992). Domtar sold the property in 1955 and the first policy issued by the defendants commenced in 1956. The defendants stress that the New Jersey Supreme Court has held that property sold before damage occurs may fall within an owned-premises exclusion. *Wickner v. American Reliance Ins. Co.*, 141 N.J. 392, 398–99, 661 A.2d 1256, 1259 (1995) (rejecting the reasoning in *Hatco*). But *Wickner* interpreted policies that excluded coverage for property damage "arising out of" an owned premises. *Id.* at 396, 661 A.2d at 1258. The policies in this case exclude damage *to* or destruction *of* property owned by the insured; the language of these exclusions is not so easily extended to include sold-and-then-damaged property.

This result is entirely consistent with *NSP*. The policies at issue in that case were in effect when the insured owned at least some of the contaminated property. *NSP*, 523 N.W.2d at 659. Our approval of the potential applicability of the owned-property exclusion was therefore no indication that coverage is barred no matter when the property damage takes place. Consistent with the best reading of the policy language before us, we hold that the owned-property exclusions and limitations in the 1956–1970 policies do not apply.

#### B.

Lloyd's offers four additional arguments against coverage for Domtar. First, Lloyd's argues that it conclusively established at trial that no appreciable damage took place during its policy periods. The jury rejected Lloyd's argument, and a jury's answer to a special verdict form can be set aside only if no reasonable mind could find as did the jury. *Hauenstein v. Loctite Corp.*, 347 N.W.2d 272, 275 (Minn.1984). Here, the evidence clearly supported the jury's answer. Domtar's expert testified that the contamination has been migrating through the soil and into the groundwater since 1956. Continental's expert believed that certain components of the contamination had moved little since discharge, but he acknowledged that movement had occurred. Granted, Lloyd's expert

testified that contaminants could not have migrated over the years to the groundwater, but instead moved rapidly through cracks in the subsurface clay at the time of the spills. However, the defendants' experts both acknowledged that there was some migration, especially with respect to the pollution that reached the groundwater. At trial, Lloyd's response was that biodegradation actually ameliorated the contamination after it was discharged. The jury apparently disagreed. There was competent evidence in the record to support the reasonableness of the jury's conclusion.

■ Second, Lloyd's points out that its 1966–1969 excess coverage requires that property damage must be "unexpected" for there to be an "occurrence." Based on an objective standard, Lloyd's contends that the contamination was "expected" because Domtar knew or had reason to know that property damage was likely to occur. The trial court denied Lloyd's request to include the issue of Domtar's expectations in the special verdict form.

■ For CGL policies, this court has interpreted the meaning of "expected" damage to require a certainty of harm on the part of the insured greater than general standards of foreseeability used to impose liability on the insured. *Continental Western Ins. Co. v. Toal*, 309 Minn. 169, 176 & n. 3, 244 N.W.2d 121, 125 & n. 3 (1976); *Bituminous Cas. Corp. v. Bartlett*, 307 Minn. 72, 77–79, 240 N.W.2d 310, 313–14 (1976). In explaining the high degree of certainty demanded, we have also equated "expected" damage with "reckless" conduct. *Ohio Cas. Ins. Co. v. Terrace Enters., Inc.*, 260 N.W.2d 450, 452–53 (Minn.1977). Of course, this standard does not preclude the use of circumstantial evidence or proof of willful blind-

ness, but it is the insured's actual expectation of damage that allows a defense to coverage.[6]

Based on the record, it was not reversible error to refuse to submit the expected-damage defense to the jury. Lloyd's is unable to identify evidence of Domtar's subjective expectations. The only evidence on point was the testimony of Eli Skorich, a retired plant worker who testified that he neither expected nor intended environmental harm from anything he did at the plant, nor was he aware of such expectations or intentions on the part of anyone else at the plant. Although we cannot say that it would have been an abuse of discretion for the trial court to submit the issue to the jury based on circumstantial evidence of Domtar's subjective expectations, the refusal to do so does not merit reversal and a new trial. In the absence of *any* evidence that Domtar expected, to a high degree of certainty, the same general type of damage for which the MPCA now seeks remedial action, the trial court properly refused to submit the issue of expected damages to the jury. *Cf. Pittston Co. v. Allianz Ins. Co.*, 905 F.Supp. 1279, 1301 (D.N.J. 1995); *Morton Int'l, Inc. v. General Accident Ins. Co. of Am.*, 134 N.J. 1, 85–87, 90–95, 629 A.2d 831, 879–80, 882–84 (1993) (allowing proof by "objective indicia" in exceptional circumstances).

■ Third, Lloyd's argues that, despite *NSP*, its 1956–1965 coverage is "accident"-based and therefore not triggered by property damage; rather, an accidental *discharge* must take place during the policy period. We disagree. It is of course true that *NSP* reviewed "occurrence"-based policies, *NSP*, 523 N.W.2d at 659, and that there is a distinction between the concepts of "accident" and "occurrence," at least in the absence of any policy language to the contrary, *Singsaas*, 307 Minn. at 155–56, 238 N.W.2d at 880 (noting the 1966 revision in standard-form

---

6. Other courts employ a more objective standard of expected environmental damage. *See Bituminous Cas. Corp. v. Tonka Corp.*, 9 F.3d 51, 52–54 (8th Cir.1993), *cert. denied*, 511 U.S. 1083, 114 S.Ct. 1834, 128 L.Ed.2d 462 (1994); *Auto-Owners Ins. Co. v. Jensen*, 667 F.2d 714, 720 (8th Cir.1981); *Bell Lumber & Pole Co. v. United States Fire Ins. Co.*, 847 F.Supp. 738, 744–45 (D.Minn.1994), *aff'd on other grounds*, 60 F.3d 437 (8th Cir.1995); *American Universal Ins. Co.*

*v. Whitewood Custom Treaters, Inc.*, 707 F.Supp. 1140, 1148–49 (W.D.S.D.1989). A purely objective test is inconsistent with this court's established interpretation of the term "unexpected" in CGL policies. In the absence of policy language to the contrary, we see no reason to depart from precedent. To do so, moreover, would undermine coverage for injuries caused by simple negligence, a result we sought to avoid in prior cases.

CGL policies); *Golden v. Lerch Bros., Inc.,* 211 Minn. 30, 34–36, 300 N.W. 207, 210–11 (1941); Kenneth S. Abraham, *Environmental Liability Insurance Law* 92 (1991). But our definition of "accident" is not as restrictive as Lloyd's claims. *See Hauenstein v. St. Paul–Mercury Indem. Co.,* 242 Minn. 354, 358–59, 65 N.W.2d 122, 126 (1954) ("accident" includes an unexpected "happening or consequence from either a known or unknown cause"; allowing recovery for damages occurring during the policy period caused by the insured's defectively manufactured plaster). More importantly, Lloyd's policies apply to "events occurring" anywhere, and define "accident" to include a series of accidents arising out of an "event or occurrence." Considering the practical nature of *NSP* and Lloyd's policy language, the actual-injury trigger applies to all of the policies at issue in this case.

Fourth and finally, Lloyd's contends that the jury should have been asked to determine whether Domtar had adequately established the terms and conditions of its 1956–1965 primary coverage with Canadian General. The found Lloyd's excess policy for 1962–1965 covers liabilities "which are also covered by and defined in the policy/ies * * * issued by" Canadian General, and the standard-form Lloyd's excess policy introduced as circumstantial evidence of 1956–1962 insurance covers property damage "arising out of the hazards covered by and as defined in the underlying" Canadian General policies. Lloyd's therefore claims that the terms and conditions of this primary coverage must be proved and satisfied as a condition precedent to invoking Lloyd's excess coverage.

▆▆▆ The initial burden of demonstrating coverage rests with the insured; the burden of establishing the applicability of exclusions rests with the insurer. *SCSC,* 536 N.W.2d at 311–14. We agree with Lloyd's and the prevailing rule that, as part of the insured's initial burden, the essential terms and conditions of coverage must be proved.[7]

When the actual policies have been inadvertently lost or destroyed, the insured may satisfy this burden with circumstantial evidence, such as proof that a particular standard-form policy was issued to the insured. By the same token, the insurer may then establish the existence, terms, and conditions of any exclusions using circumstantial evidence.

However, we see no sense in declaring that the trial court erred because Domtar's dispute with Canadian General has not yet been resolved. Although the record is not entirely clear, our reading is that the existence of primary coverage for 1956–1965 was simply not litigated by the parties nor decided by the trial court during the proceedings below. Instead, the trial court decided to proceed while Canadian General pressed its jurisdictional arguments through the appellate courts, holding Domtar "responsible" for the uncontested policy limits of the 1956–1965 primary coverage. In this court, Lloyd's does not object to the absence of Canadian General at trial nor to the trial court's decision to consider Domtar self-insured while its case against Canadian General awaits trial. The sufficiency of the evidence regarding Domtar's 1956–1965 primary coverage should be judged by the standard we articulated above, but the trial court in this case had no occasion to rule on the evidence of primary coverage. In effect, there is no ruling for us to reverse and no argument against the trial court's order to consider. Lloyd's is therefore liable as an excess insurer for the 1956–1965 policy periods and, until Domtar's dispute with Canadian General is resolved, Domtar will be considered self-insured for this period. In subsequent proceedings, if the evidence of primary coverage for this period is found to be insufficient or if the primary policies somehow bar coverage, then, consistent with the language of Lloyd's policies, Lloyd's is not liable on its 1956–1965 policies.

## C.

▆▆▆ Continental raises three additional arguments against coverage for Domtar.

**7.** *See, e.g., Bituminous Cas. Corp. v. Vacuum Tanks, Inc.,* 975 F.2d 1130, 1131–33 (5th Cir. 1992); *American States Ins. Co. v. Mankato Iron & Metal, Inc.,* 848 F.Supp. 1436, 1441–46 (D.Minn.1993); *Town of Peterborough v. Hartford Fire Ins. Co.,* 824 F.Supp. 1102, 1108–10 (D.N.H. 1993); *Emons Indus. v. Liberty Mut. Fire Ins. Co.,* 545 F.Supp. 185, 187–89 (S.D.N.Y.1982).

Continental's first concern is that the jury should have been asked to consider the defense of "lack of fortuity." Continental's policies do not refer to "fortuity" as a requirement for coverage. They do, however, contain an exclusion for "any act or omission committed with intent to cause injury to persons or property." The trial court did include this exclusion in the special verdict form, but the jury concluded that Continental failed to demonstrate that Domtar intended to injure property. *See SCSC,* 536 N.W.2d at 313–14 (the insurer bears the burden of establishing the applicability of an exclusion as an affirmative defense). Continental is, in essence, attempting to insert an exclusion for "expected" damage into its policies; in fact, Continental's requested special verdict question was, "[S]hould Domtar have *expected* property damage prior to 1965." (Emphasis added). We see no good reason to rewrite Continental's policies.

■■■■ Second, Continental argues that the "known-loss" doctrine bars coverage. This argument has clearer support in our case law, but it fails for lack of evidence in the record. In *Waseca Mut. Ins. Co. v. Noska,* we explained,

> Insurance cannot be issued for a known loss. *Oster v. Riley,* 276 Minn. 274, 287, 150 N.W.2d 43, 52 (1967) (Otis, J., dissenting). Once the loss has occurred, there is no longer any "risk." Hence, where the loss has occurred prior to the application for insurance, the relevant question is * * * whether the parties, particularly the insured, knew of the loss at the time of application, since that knowledge would be nearly conclusive evidence as to bad faith.

331 N.W.2d 917, 924–25 n. 6 (Minn.1983). In this state, "known loss" is a fraud-based defense. *See Franklin v. Carpenter,* 309 Minn. 419, 424–25, 244 N.W.2d 492, 496 (1976); *Oster,* 276 Minn. at 280–81, 150 N.W.2d at 48–49; *id.* at 287, 150 N.W.2d at 53 (Otis, J., dissenting). As such, the doctrine requires proof that the insured withheld material information concerning the existence of property damage, including the initiation or continuation of soil or groundwater contamination, for which the insured subsequently obtained insurance. The insured need not know of the exact nature or extent of the contamination, but there must be evidence that the insured knew of the property damage when it purchased insurance that would otherwise cover the loss. There is no such evidence in the record before us.

■■■■ Third, Continental claims its "retrospective premium rating adjustment plan" required Domtar to notify Continental of the property damage at issue in this case within 5 years. Continental argues that an unadjusted premium constitutes lack of consideration. This argument lacks merit. The language of the endorsement does not indicate that it excludes unknown losses. Even if it did, we would be hard pressed to conclude that the policy is void and lacks "consideration" simply because the premium was not *adjusted.* It is uncontested that Domtar paid the standard premium.

Continental offers no convincing argument for disturbing the lower courts' rulings that it breached its duty to defend and that it has a duty to indemnify Domtar. *See SCSC,* 536 N.W.2d at 311–14, 315 (explaining that the duty to defend is broader than the duty to indemnify). Domtar met its burden of establishing coverage and no defenses to coverage apply.

## V.

### Objections to the Awards of Defense and Litigation Costs

Continental also challenges the jury's award of $1,154,318.50 in defense costs to Domtar, as well as the trial court's order that Continental pay $1,663,674.25 in attorney fees related to the litigation of this action.

### A.

■■■ We first address Continental's challenges to the award of defense costs. Continental first argues that the trial court erred in concluding that certain investigation and compliance costs incurred by Domtar were defense costs not subject to policy deductibles or liability limits. Because Domtar was admittedly required to incur these costs under the terms of the RFRA, Continental argues that all of these "defense" expenses

were in fact a necessary part of the remediation of the Site and, thus, "indemnity" costs.

Continental cites this court's decision in *3M*, 457 N.W.2d at 184, as support for its position. In *3M*, this court was confronted with certified questions from the federal district court regarding the scope of coverage under a CGL policy. The insurers in *3M* argued that claims for environmental clean-up costs mandated by the MPCA did not fall within the scope of "damages" covered under CGL policies. *Id.* at 178. We rejected the insurers' reliance on the distinction between legal and equitable remedies in defining the scope of coverage, and held that costs "necessary to effectuate the clean[-]up" of environmental contamination were covered "damages." *Id.* at 184. Because two of the certified questions we answered affirmatively in *3M* referred to "investigation" as well as "remediation" costs, Continental contends that *3M* definitively establishes that investigation costs are indemnity "damages" and not defense costs. *See id.* at 178 n. 2. We disagree. Our decision in *3M* simply did not address the proper classification of investigation costs, but rather addressed the narrow issue of whether government-mandated clean-up costs fall within the scope of CGL policy coverage in the first instance.

Domtar contends that its investigation and compliance costs cannot be considered remediation (*i.e.*, indemnity) costs because at the time of trial the MPCA had yet to select a remedy for the Site. Domtar asserts that it incurred the costs in an attempt to "avoid or at least minimize the cost of the remediation." Domtar points to the MPCA's decision—later reversed—declining to name Domtar as a responsible party for the Sediments Operable Unit as evidence that it acted prudently and minimized at least its initial liability, which ultimately would have accrued to the benefit of its insurers.

In affirming the trial court's award, the court of appeals found compelling that "the expenses [were] incurred to avoid more onerous demands and not alone to comply with regulatory demands." *Domtar II*, 552 N.W.2d at 751. We likewise consider persuasive the considerable evidence presented at trial indicating that, while Domtar admittedly incurred many of the disputed costs in compliance with the RFRA, the costs served the dual purpose of furthering Domtar's objective of minimizing both the scope and magnitude of its ultimate liability for clean-up costs.

In arguments before this court, Continental suggested that only those costs incurred to *defeat* liability are eligible as defense costs, thus excluding costs incurred by an insured in an attempt to *minimize* the scope or magnitude of liability. We disagree. We believe the better approach is to allow an insured to receive as defense costs those expenses reasonably necessary *either* to defeat liability *or* to minimize the scope or magnitude of such liability. *See Aerojet–Gen. Corp. v. Transport Indem. Co.*, 50 Cal. App.4th 354, ——, 53 Cal.Rptr.2d 398, 408 (concluding that a reasonable defense "even for a clearly liable party" requires investigative studies necessary to limit damages or the scope of remedial action the party is required to undertake), *rev. granted*, 57 Cal. Rptr.2d 277, 923 P.2d 766 (1996). Such an approach encourages insureds to accept responsibility for clean-up costs not seriously in dispute without fear that all investigation and compliance costs will thereafter be considered indemnity costs by default.

It is axiomatic that in order to establish its right to defense costs, an insured must first meet its burden of establishing that the costs sought were in fact reasonable and necessary to its defense of the action. *See Pagett v. Northern Elec. Supply Co.*, 283 Minn. 228, 236, 167 N.W.2d 58, 64 (1969) (stating that a plaintiff must prove his damages by a fair preponderance of the evidence); *see also Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.*, 790 F.Supp. 1318, 1338 (E.D.Mich.1992) (concluding that an insured bears the burden of showing investigative studies were "necessary and proper" to limit the scope or cost of remediation). But if an insured meets this burden at trial, the fact that otherwise allowable defense costs serve the dual purpose of complying with the RFRA does not, in our estimation, render such costs indemnity costs. *See, e.g., Hi–Mill Mfg. Co. v. Aetna Cas. & Sur. Co.*, 884 F.Supp. 1109, 1117 (E.D.Mich.1995), *aff'd*, 98

F.3d 1341 (6th Cir.1996) (unpublished table decision); *Aerojet,* 50 Cal.App.4th at ——, 53 Cal.Rptr.2d at 409; *General Accident Ins. Co. of Am. v. New Jersey Dep't of Envtl. Protection,* 143 N.J. 462, 476, 672 A.2d 1154, 1162 (1996). We therefore conclude that the trial court did not err in determining that the investigation and compliance costs Domtar incurred in an effort to minimize the potentially staggering scope and magnitude of its liability for the Site were defense costs not subject to policy limits under Domtar's CGL policies with Continental.

■ Continental next contends that the trial court improperly held Continental liable for all defense costs even though Domtar is also proceeding against Canadian General. Continental relies on our decision in *Jostens, Inc. v. Mission Ins. Co.,* which provides that when two or more insurers arguably have primary coverage for a claim, each should share equally in the insured's defense costs. 387 N.W.2d 161, 167 (Minn.1986). However, *Jostens* clearly states that an insured "may * * * recover his costs * * * from *either or both* insurers" and that only *"as between them"* are insurers equally liable for such costs. *Id.* (emphasis added). Continental's remedy, if any, is to seek contribution from Canadian General.

■ Finally, Continental asserts that the trial court erred in awarding Domtar defense costs it incurred prior to tendering the claim to Continental for defense. Although the MPCA sent notice to Domtar of its potential liability on November 28, 1990, Domtar spent several months searching its insurance records and did not tender its defense request until July 2, 1991. The jury awarded Domtar defense costs incurred prior to Domtar's formal tender of the claim. After this court released its decision in *SCSC,* the trial court amended its award of litigation costs to exclude pre-tender attorney fees. However, the trial court did not similarly amend the jury's award of defense costs.

In *SCSC,* this court stated, "Generally * * * the formal tender of a defense request is a condition precedent to the recovery of attorney fees that a party incurs defending claims * * *." *SCSC,* 536 N.W.2d at 316. Domtar argues that the word "generally"

implies that the rule is not to be applied in lock-step fashion. Domtar argues—and the court of appeals agreed—that the award of pre-tender costs was appropriate because of Domtar's diligence in reconstructing its insurance coverage and because Continental presented no evidence that it would have elected to defend had the tender been made earlier. *Domtar II,* 552 N.W.2d at 752 (noting that Domtar tendered the defense "at the earliest feasible time").

Continental counters that, under *SCSC,* the tender of the claim is a clear condition precedent to the duty to defend. Moreover, Continental asserts that pre-tender costs should not be allowed merely because an insurer breaches its duty to defend its insured. The remedy for breach is the benefit of the bargain; to allow Domtar pre-tender costs would go beyond the benefit of the bargain and would also reward Domtar for its "lack of foresight" in failing to maintain adequate records of its insurance policies.

■ In *SCSC,* we clearly articulated the general rule that an insured does not invoke its insurer's duty to defend until it properly tenders a defense request. *SCSC,* 536 N.W.2d at 317. Logically, then, an insurer cannot be held responsible for defense costs incurred prior to the tender of the defense request giving rise to the insurer's duty to defend, the diligence of the insured notwithstanding. While there may be, as we implied in *SCSC,* circumstances justifying a departure from the general rule, we do not find such compelling circumstances present in this case. Accordingly, we reverse the award of defense costs and remand with instructions that the trial court reduce the award by the amount of defense costs incurred prior to July 2, 1991.

### B.

Continental also challenges the amount of litigation-related attorney fees awarded Domtar by the trial court. *See Morrison v. Swenson,* 274 Minn. 127, 137–38, 142 N.W.2d 640, 647 (1966) (concluding that an insured may recover legal fees incurred in pursuing a declaratory judgment action against an insurer as a direct loss incident to the insurer's

breach). First, Continental contends that Domtar was erroneously awarded attorney fees incurred to litigate issues unrelated to Continental. Continental asserts that the trial court erroneously concluded that it was not reasonably possible for Domtar to segregate its attorney billing by defendant or task activity and that the trial court erroneously awarded Domtar attorney fees incurred in "unsuccessfully" litigating the indemnity issue. Second, Continental contends that the trial court erred in awarding attorney fees exceeding those customarily charged for similar matters by attorneys in Minnesota.

When two defendants independently breach separate contracts, and it is not "reasonably possible" to segregate the damages, the defendants are jointly and severally liable. *Lesmeister v. Dilly*, 330 N.W.2d 95, 102 (Minn.1983) (citing *Northern Petrochem. Co. v. Thorsen & Thorshov, Inc.*, 297 Minn. 118, 128, 211 N.W.2d 159, 167 (1973)). Continental points to this rule and argues that the trial court erred in concluding that it was not reasonably possible for Domtar to segregate its attorney fee billings on a policy-by-policy or defendant-by-defendant basis.

Continental relies on testimony from a post-trial motion hearing in which witnesses for Domtar admitted that in some circumstances it would be possible to segregate billings by activity and opposing party, provided the client requested such billing in advance. Continental also points to Domtar's ability to allocate the fees attributable to its jurisdictional dispute with Canadian General as evidence that a post-billing allocation would be possible and that fees could easily have been segregated at the time of the initial billing.[8] Because Domtar should have anticipated the need for segregated billing, Continental argues, it is unfair to hold Continental liable for fees attributable to claims against defendants dismissed prior to trial.[9]

When recovery is allowed under *Morrison*, we review the award of fees and costs under an abuse of discretion standard. *See Morrison*, 274 Minn. at 137–38, 142 N.W.2d at 647; *see also Blattner v. Forster*, 322 N.W.2d 319, 321 (Minn.1982); *Romain v. Pebble Creek Partners*, 310 N.W.2d 118, 124 (Minn.1981). Domtar contends that the trial court did not abuse its discretion in awarding attorney fees in this case. Domtar argues that the evidence at trial established that it would be impossible to segregate fees because in a declaratory judgment action of this nature many of the legal issues, strategic considerations, factual developments, and discovery practices are common to all defendants. That Domtar was able to segregate attorney fees regarding the discrete issue in Canadian General does not establish that it could similarly segregate its attorney fees in this matter. Finally, Domtar cites the trial court's observation that Continental could have avoided any dispute as to attorney fees had it not wrongfully breached its duty to defend Domtar. *See Fireman's Fund Ins. Cos.*, 790 F.Supp. at 1345 ("Had Wausau accepted the tender of defense and retained or appointed counsel to represent the policyholders, we would not today be struggling with a determination over which attorney[ ] fees were reasonable and necessary defense costs.").

We conclude that the trial court did not abuse its discretion in awarding attorney fees. The hearing testimony established, in short, that while it might have been reasonably possible to segregate billing by activity and defendant at the time of billing, such billing is not typical and was not rendered in this matter. We decline Continental's invitation to retroactively impose upon Domtar an obligation to segregate its billing for attorney fees in a manner that is not typical in such litigation. Moreover, we believe that such detailed billing would be of questionable utility insofar as a declaratory judgment action

---

8. Paul Zevnik, national counsel for Domtar, testified that the allocation for the appeal of the Canadian General jurisdictional issue was possible "because our law firm and others had anticipated that that might be necessary and so it was easy to do so on a retrospective basis."

9. Zevnik also testified, however, that all billing attributable to the attorney who principally worked on the "sudden and accidental language" issue related to the defendants dismissed prior to trial was deleted from Domtar's request for attorney fees.

with multiple defendants involves many common legal issues and considerations that would be difficult, if not impossible, to segregate by individual defendant insurer or policy even at the time the initial bill was rendered.

■ Continental next contends that Domtar should not recover fees incurred for the purpose of litigating the indemnity issue because the jury did not find a breach of the duty to indemnify. We find no merit in this argument. While the legal question of breach of duty to indemnify was not submitted to the jury, the jury resolved factual issues submitted to it in favor of Domtar. Because this was a declaratory judgment action to establish Continental's duty, the fact that no remediation costs were awarded does not mean that Domtar was unsuccessful on the issue, as Continental seems to contend.

■ Continental asserts that fees charged by plaintiff's counsel Paul Zevnik were unreasonable. Mr. Zevnik is a partner in a national insurance coverage litigation practice in Washington, D.C. and billed Domtar between $400 and $475 an hour for his services. Continental contends that because Zevnik's hourly rate exceeds that customarily charged for similar services in Minnesota, it is unreasonable and should be reduced to reflect the fee customarily charged in Minnesota.

Under Minn. R. Prof. Conduct 1.5, an attorney's fee must be reasonable. One factor in determining the reasonableness of the fee under Rule 1.5 is "the fee customarily charged in the locality for similar legal services." Minn. R. Prof. Conduct 1.5(a)(3). Continental fails to acknowledge, however, that the fee customary for the locality is only one of several factors. Other factors consider the "novelty and difficulty of the questions involved" and the "experience, reputation, and ability" of the attorney. Minn. R. Prof. Conduct 1.5(a)(1), (7). Thus, even assuming

that Continental is correct in asserting that Rule 1.5 provides the standard for the reasonableness of attorney fees in a breach of duty to defend action, the trial court properly considered these other factors, including Mr. Zevnik's national experience in insurance recovery litigation and his familiarity with the defensive posture and tactics of various insurers, in passing upon the reasonableness of Domtar's request for attorney fees. *See Holt v. Swenson*, 252 Minn. 510, 517, 90 N.W.2d 724, 728 (1958) (stating that the "character, ability, and experience" of the attorney, "the difficulty of the propositions involved," and the "results obtained" are among factors in determining the reasonableness of attorney fees). Accordingly, we conclude that the trial court did not abuse its discretion in its award of attorney fees.[10]

## VI.

We affirm the trial court's conclusions that Continental breached its duty to defend; that the defendants have a duty to indemnify Domtar, excluding self-insured periods; and that no defenses to coverage apply. We reverse the award of defense costs only insofar as it included pre-tender costs, and we remand solely for a factual determination as to the extent of such costs.

Affirmed in part, reversed in part, and remanded.

---

10. Continental also argues that the rule of *Morrison*, allowing an insured to recover attorney fees incurred in a successful action to establish an insurer's obligations, is unconstitutional. *Morrison*, 274 Minn. at 137–38, 142 N.W.2d at 647. Domtar asserts that Continental waived the issue by failing to raise it before the trial court. Continental provides no citation to the record supporting its claim that the issue was raised before the trial court. Our review of the record does not support Continental's claim. Accordingly, we decline to address the issue on review. *See Thiele v. Stich*, 425 N.W.2d 580, 582–84 (Minn. 1988).