WESTFIELD INSURANCE COMPANY, Respondent/Cross–Appellant,

v.

WENSMANN, INC., f/k/a Wensmann Homes of Rochester, Inc., Defendant,

Diseworth at Somerby, A Planned Community, Appellant/Cross–Respondent.

No. A13–0532.

Court of Appeals of Minnesota.

Dec. 16, 2013.

Deborah C. Eckland, Scott R. Johnson, Goetz & Eckland P.A., Minneapolis, Minnesota, for respondent/cross-appellant, Westfield Insurance Company.

Douglas A. Boese, Dunlap & Seeger, P.A., Rochester, Minnesota, for appellant/cross-respondent.

Considered and decided by SMITH, Presiding Judge; JOHNSON, Judge; and RODENBERG, Judge.

## OPINION

RODENBERG, Judge.

In this insurance coverage appeal, appellant/cross-respondent, Diseworth at Somerby, A Planned Community, argues that the district court erred in granting summary judgment in favor of respondent/cross-appellant, Westfield Insurance Company, concluding that, as a matter of law, the insurance policy at issue excluded coverage for defective construction work because the insured knew of the property damage prior to the inception of the policy. Westfield cross-appeals and argues that the district court erred both in allowing Diseworth to intervene in the declaratory judgment action and in vacating the default judgment that Westfield had obtained in the coverage litigation. We hold that, under Minn. R. Civ. P. 24.01, the district

court did not err in allowing Diseworth to intervene in Westfield's declaratory judgment action because Diseworth had an interest in the coverage suit. We further hold that vacation of a default declaratory judgment was appropriate where the intervenor seeking vacation was not notified of the declaratory judgment action until after the default judgment was obtained, where that intervenor acted with due diligence in moving to vacate, showed that the policy at issue may provide coverage for the alleged defects, and made an adequate showing of prejudice. Summary judgment was appropriate declaring noncoverage for some of the claimed property damage but was improperly granted as to those items of property damage with respect to which there remain genuine issues of material fact regarding coverage. We therefore affirm in part, reverse in part, and remand.

## FACTS

Diseworth's complaint against Wensmann, Inc., formerly known as Wensmann Homes of Rochester, Inc. (which makes no appearance on appeal) and Westfield's declaratory judgment action seeking a declaration of noncoverage both arise from Wensmann's construction of nine buildings (18 townhome units) operated by Diseworth in Byron. Wensmann was the general contractor in the construction of the 18 units and was responsible for both the design and construction of the units built after 2003. Herbert Wensmann was the owner of Wensmann. Tim Houge served as Wensmann's site supervisor at Diseworth during times relevant to this appeal. Terry Wensmann, a vice president of Wensmann, was in charge of the superintendents and management for the construction at Diseworth. Dupont Brick & Stone, Inc. and South Metro Masonry were the subcontractors responsible for constructing the brick arches at issue in this appeal.

Each Diseworth unit had one, two, or three brick arches under the unit's back deck. Diseworth alleges, and Westfield does not dispute, that the arches were not weight-bearing and were primarily decorative. All of the buildings were built before April 1, 2007, the date on which Westfield issued the comprehensive general liability (CGL) policy of insurance to Wensmann pursuant to which coverage is here in dispute. The last certificate of occupancy was issued in February 2007.

Wensmann first became aware of cracks in the brick arches when the homeowner of unit 934 submitted the first of two requests for warranty work. The first work order, dated July 27, 2005, requested service to "repair brick arch (lower level patio) it's falling." The repair work was completed on September 15, 2005. After being notified of the warranty work request, Houge hired Kent Jones, a structural engineer employed by Encompass, Inc., to create a design plan for future arches. Houge requested Jones's design because the subcontractors had not earlier used any written design in building the existing arches. Jones inspected a number of brick arches at Diseworth and another development in the same community in 2005. In his deposition, Jones said that Houge told him that the arches were cracking where the arch meets the post. Jones testified that the cracks had been tuck-pointed and had subsequently re-cracked with some of the cracks being significant. On September 20, 2005, Jones provided Houge with an arch design for future arches. That design was not used to repair any existing arches but Houge provided Jones's design plan to the subcontractors for the last four units built: 880, 882, 960, and 954. A second warranty work request for unit 934 came on May 26, 2006, requesting a repair of the brick arch: "Repair the brick arch by the patio area by June 15th[, 2006] or

Terry [Wensmann] wants Dupont to do it and back charge [South Metro Masonry]."

*Negligence-related complaint*

Because of what it believes were continuing problems with the construction, Diseworth sued Wensmann in Olmstead County district court for negligence and breach of statutory warranties relating to claims of failed arches and water infiltration issues.

Wensmann had gone out of business by the time of Diseworth's suit against it. Westfield appointed counsel to defend Wensmann. Counsel interposed an answer disputing liability and damages. While the masonry complaints were documented prior to April 1, 2007, there is no documentation of water infiltration claims before that date. When deposed, Herbert Wensmann stated that from 2004 to 2006 "there could have been some water infiltration problems, and there could have been some deck heave or something. I don't recall. I wasn't—I came down there once a week." Our review of the record reveals no other reports or complaints of water damage prior to April 1, 2007.

On August 29, 2012, Diseworth's expert, Mark Soderland from Advanced Consulting and Inspection (ACI), provided a summary detailing the defects he located at Diseworth and his recommendations for repair. The ACI report detailed a total of seven areas of deficiencies in the construction of Diseworth: siding, brick veneer, windows and doors, flashing, attics, caulking/sealing, and masonry veneer arches below the deck structures.

*This litigation*

On October 12, 2011, Westfield commenced this declaratory judgment action in Scott County, alleging that Wensmann knew of the property damage alleged by Diseworth prior to acquiring the policy from Westfield on April 1, 2007, and thus the loss is excluded from the Westfield insurance policy. Westfield named only Wensmann as a defendant in the declaratory judgment action. Wensmann did not answer Westfield's complaint. Westfield moved for default judgment, which was granted by the district court on February 29, 2012. On April 4, 2012, Westfield's attorney withdrew from representing Wensmann in the Olmstead County action. Counsel's withdrawal was Diseworth's first awareness of the declaratory judgment action in Scott County.

On April 19, 2012, Diseworth moved to intervene in the Scott County declaratory judgment action pursuant to Minn. R. Civ. P. 24.01 and Minn.Stat. § 555.11 (2012), and to vacate the default judgment pursuant to Minn. R. Civ. P. 60.02. The Scott County district court granted Diseworth's motions on June 4, 2012. On June 6, 2012, Diseworth filed its answer to Westfield's complaint. Westfield requested permission to file a motion to reconsider pursuant to Minn. Gen. R. Pract. 115.11, which the district court denied. On July 18, 2012, Westfield appealed the Scott County district court order allowing Diseworth to intervene and vacating the default judgment. We dismissed that appeal as having been taken from a non-appealable order. Westfield then moved for summary judgment in the declaratory judgment action, arguing that Wensmann knew of the property damage alleged in Diseworth's complaint at the time the Westfield policy took effect on April 1, 2007, and that coverage for the claims was therefore excluded by the policy language. The district court granted Westfield's motion for summary judgment on February 4, 2013. Diseworth appealed and Westfield cross-appealed from the order granting Diseworth's motion to intervene and to vacate the default judgment.

*Relevant policy language*

Westfield's CGL policy was effective from April 1, 2007 to April 1, 2008. The relevant insuring agreement reads:

1.  Insuring agreement

a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

. . . .

b.  This insurance applies to "bodily injury" and "property damage" only if:

. . . .

(3) Prior to the policy period, no insured . . . knew that the "bodily injury" or "property damage" had occurred in whole or in part. If such a listed insured . . . knew prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

. . . .

d.  "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured . . . :

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

The policy defines property damage as:

a.  Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.  Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

With respect to who qualifies as an "insured," the policy provides:

1.  If you are designated in the Declarations as:

. . . .

d.  An organization other than a partnership, joint venture or limited liability company, you are an insured.[1] Your "executive officers" and directors are insured, but only with respect to their duties as your officers and directors . . . .

2.  Each of the following is also an insured:

a.  Your . . . "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.

---

**1.** *Wensmann is listed as a corporation in the* *Westfield policy declarations.*

## ISSUES

I. Did the district court err in allowing Diseworth to intervene in Westfield's declaratory judgment action against Wensmann?

II. Did the district court abuse its discretion in vacating the default judgment entered against Wensmann?

III. Did the district court err in granting summary judgment to Westfield based on the policy language relating to Diseworth's claims of damage resulting from improper design and construction of the brick arches and claims of damage resulting from water infiltration?

## ANALYSIS

### I.

■ Westfield argues in its cross-appeal that we should not reach the merits of the coverage question because the district court erred in allowing Diseworth to intervene in Westfield's declaratory judgment action against Wensmann under Minn. R. Civ. P. 24.01. Westfield further argues that Diseworth did not have standing to intervene and it had no affected interest within the meaning of Minn.Stat. § 555.11. We consider these issues first, as we reach the merits of Diseworth's appeal only if Diseworth was properly permitted to intervene and only if its motion to vacate the default judgment was properly granted.

■ We generally review de novo orders granting intervention as a matter of right pursuant to Minn. R. Civ. P. 24.01. *State Fund Mut. Ins. Co. v. Mead,* 691 N.W.2d 495, 499 (Minn.App.2005). Our supreme court has considered the issue of a claimant intervening in a coverage action seeking a declaration of noncoverage and said: "[W]hen the issue of contract liability is tried separately, the injured party, in the discretion of the trial court, should be permitted to intervene in the trial of that issue." *Miller v. Mkt. Men's Mut. Ins. Co.,* 262 Minn. 509, 513, 115 N.W.2d 266, 269 (1962). Although the quoted language was not of dispositive importance in *Miller,* the *Miller* court's assessment of the propriety of a claimant intervening in coverage litigation guides our analysis.[2] Allowing a claimant to intervene "may prevent a multiplicity of suits in that after recovery of a judgment the injured party would have a right of action by garnishment or otherwise against the insurer." *Id.* at 512, 115 N.W.2d at 269. "[A]nyone shall be permitted to intervene in an action," Minn. R. Civ. P. 24.01, upon demonstrating the following:

(1) timely application for intervention;

(2) an interest relating to the property or transaction which is the subject of the action;

(3) circumstances demonstrating that the disposition of the action may as a practical matter impair or impede the

**2.** Two types of intervention exist under the Minnesota Rules of Civil Procedure: intervention as of right and permissive intervention. Intervention as of right requires that the intervening party has an interest in the subject of the specific litigation, as discussed below, while permissive intervention only requires that the intervening party has a claim or defense that shares a common question of law or fact with the main action. Minn. R. Civ. P. 24.01, 24.02; *see also Heller v. Schwan's Sales Enters., Inc.,* 548 N.W.2d 287, 292 (Minn.App. 1996), *review denied* (Minn. Aug. 6, 1996).

Review of permissive intervention is for an abuse of discretion, *Heller,* 548 N.W.2d at 292, while intervention as of right is subject to de novo review, *Mead,* 691 N.W.2d at 499. Our supreme court in *Miller* determined that the denial of a request to permissively intervene was not appealable, 262 Minn. at 512–13, 115 N.W.2d at 269, and thus its language discussing interventions generally was not dispositive. We nonetheless consider the *Miller* language informative to our analysis of determining whether granting Diseworth's request to intervene as of right was proper here.

party's ability to protect that interest; and

(4) a showing that the party is not adequately represented by the existing parties[.]

*Blue Cross/Blue Shield of R.I. v. Flam*, 509 N.W.2d 393, 395 (Minn.App.1993), *review denied* (Minn. Feb. 24, 1994). "The policy of encouraging intervention whenever possible is favored by courts, and the rule should be liberally applied." *Id.* at 396.

### Timeliness

■ " 'Timeliness' of an application to intervene is determined on a case-by-case basis and depends on factors such as (1) how far the subject suit has progressed; (2) the reason for delay in seeking intervention; and (3) any prejudice to existing parties because of the delay." *Halverson ex rel. Halverson v. Taflin*, 617 N.W.2d 448, 450 (Minn.App.2000). Because Wensmann failed to answer in the declaratory judgment action, judgment against it was rendered by default. Diseworth's application for intervention was timely. Diseworth filed its motion to intervene within two weeks of learning of the declaratory judgment action. Diseworth unquestionably acted with due diligence in seeking intervention and was not at fault for not having sought to intervene earlier. In *Erickson v. Bennett*, we considered the requirement of timeliness when the intervenor was delayed because the intervenor was unaware of the progress of the case and the fact that one party was in default. 409 N.W.2d 884, 886–87 (Minn.App.1987). "Under these circumstances, timeliness does not turn on when [the intervenor] first became aware of the action, but rather on how quickly it acted once it learned

that its interests were not protected by the existing parties." *Id.* at 887. Here, Diseworth timely applied to intervene.

### Interest

The interest required for an intervention under rule 24.01 is broader than the interest required under section 555.11 because rule 24.01 governs who has a right to intervene, while section 555.11 governs who must be joined in a declaratory judgment action. Under rule 24.01, a nonparty seeking to intervene must demonstrate that its interest in the litigation "relates to the property or transaction involved in the underlying action." *Minneapolis Star & Tribune Co. v. Schumacher*, 392 N.W.2d 197, 207 (Minn.1986); *see* Minn. R. Civ. P. 24.01. Wensmann has, by all accounts, ceased doing business. If Diseworth has a credible claim that Wensmann's CGL policy covers its claims against Wensmann, resort to recovery under that policy may be Diseworth's best, and perhaps only, source of recovery for any losses it can prove. Diseworth thus has an interest in intervening.

### Impair or impede Diseworth's ability to protect its interest

The procedural history of this case and Wensmann's having gone out of business strongly support the conclusion that a default declaration that Westfield owes no duty to indemnify Wensmann impairs Diseworth's potential to collect any judgment it might ultimately obtain against Wensmann.[3] Although the Diseworth case against Wensmann in Olmstead County is not before us, Diseworth appears to have facially viable claims. Diseworth will seemingly not be bound on the coverage question as decided by default in the Scott County declaratory judgment action unless

---

**3.** The "your work" and other exclusions may apply to all or part of Diseworth's claims, but those issues are not before us on appeal.

it is made a party to the coverage litigation. *See* Minn.Stat. § 555.11. If not allowed to intervene in the coverage litigation, Diseworth stands to either bear the entire burden of the alleged property damage to the townhomes without recourse to Wensmann's CGL policy or be drawn into further litigation regarding the coverage issues under Wensmann's CGL policy. *See Miller,* 262 Minn. at 512, 115 N.W.2d at 269 (explaining that allowing intervention "may prevent a multiplicity of suits").

*Not adequately represented*

The final factor requires a showing that Diseworth was not adequately represented by either Westfield or Wensmann, the only named parties when Westfield commenced the declaratory judgment action. *See Blue Cross/Blue Shield,* 509 N.W.2d at 395. Westfield did not name Diseworth as a party in the declaratory judgment action and Wensmann failed to appear or answer Westfield's complaint for declaratory judgment. It is evident that neither Westfield nor Wensmann adequately represent Diseworth's interests in the coverage litigation. Indeed Wensmann is not even representing its own interests. *See Am. States Ins. Co. v. Ankrum,* 651 N.W.2d 513, 523–24 (Minn.App.2002) (approving consideration of a named party's default as a factor favoring intervention).

We conclude that, in light of the language of our supreme court in *Miller,* the district court did not err in granting Diseworth's motion to intervene under Minn. R. Civ. P. 24.01. All of the relevant factors under *Blue Cross/Blue Shield* support allowing Diseworth to intervene in Westfield's coverage suit.

*Justiciable controversy*

■ Westfield contends that, in order for Diseworth to intervene in the declaratory judgment action, a justiciable controversy must exist between Diseworth and Westfield. We disagree. Minn.Stat.

§ 555.11 provides that "[w]hen declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding." A justiciable controversy between an insurer and a party making a claim against the insured is not a prerequisite to the claimant intervening in a declaratory judgment action initiated by the insurer against its insured to declare noncoverage. *See Miller,* 262 Minn. at 512, 115 N.W.2d at 269. The existence of a justiciable controversy between the insured and the insurer at the time of commencement of the action seeking a declaration of noncoverage satisfies the justiciable controversy requirement of chapter 555. Westfield itself asserted that a justiciable controversy existed between it and Wensmann when it asked the district court to adjudicate that controversy in the declaratory judgment action. And, as discussed above, rule 24.01 allows Diseworth's intervention in that action.

Westfield also cites *Seiz v. Citizens Pure Ice Co.,* 207 Minn. 277, 290 N.W. 802 (1940), in support of its argument that a justiciable controversy must exist between the claimant and the insurer in order for a claimant to participate in the coverage action. In *Seiz,* the plaintiff commenced a declaratory judgment action against his employer, seeking a declaration regarding his rights to unemployment benefits should he later become unemployed. 207 Minn. at 278–80, 290 N.W. at 802–03. Our supreme court held the declaratory judgment action to be improper because the plaintiff was employed with Citizens Pure Ice Company at the time he brought the action. *Id.* at 283, 290 N.W. at 805. Therefore, there was no justiciable controversy regarding his eligibility for unem-

ployment benefits. The supreme court held that the declaratory judgment action requires a justiciable controversy between the plaintiff and the defendant. *Id. Seiz* is readily distinguishable from our case. Here, Diseworth did not commence the coverage action. It was not named as a party by Westfield in the declaratory judgment action. It did not even know that the declaratory judgment action had been commenced until after Wensmann had defaulted. Had Diseworth attempted to sue Westfield seeking a declaration of coverage in anticipation of the possibility of a judgment against Wensmann in the Olmstead County case, *Seiz* might apply. But that is not this case. Here, Westfield seeks a declaration that it owes no duty of indemnity to its named insured in an action commenced only against the insured. Diseworth seeks only to intervene in the coverage litigation commenced by the insurer.

Westfield also argues that allowing Diseworth to intervene amounts to an impermissible direct action by an injured party against the tortfeasor's insurer. *See Anderson v. St. Paul Fire & Marine Ins. Co.,* 414 N.W.2d 575, 577 (Minn.App.1987) ("[A]n injured third party claimant is not privy to the insurance contract and cannot sue an insurer directly for failure to pay a claim but must first obtain a judgment against the insured."). In *Anderson,* the alleged injured party commenced a declaratory judgment action against the alleged tortfeasor's insurance company. *Id.* at 576. We explained that a claimant's declaratory judgment action seeking to declare coverage under a tortfeasor's insurance policy amounted to an impermissible direct action, regardless of the tortfeasor being a defunct or disinterested party. *Id. Anderson* is not applicable here. Diseworth did not commence a direct action against Westfield. As an intervenor in the action commenced by Westfield, Diseworth

attempts to protect its interests in potential future recovery from Wensmann and its interest in avoiding involvement in multiple lawsuits, should Diseworth prevail in the underlying Olmstead County suit. *See Miller,* 262 Minn. at 512, 115 N.W.2d at 269 (explaining that allowing intervention "may prevent a multiplicity of suits").

Westfield points to no persuasive authority, and we have found none, that requires an intervenor to demonstrate the existence of an independent justiciable controversy between a claimant and an insurer when the claimant seeks to intervene in the insurer's declaratory judgment action against its insured. And the language of our supreme court in *Miller* suggests otherwise.

We also observe the statutory requirement that "all persons shall be made parties who have or claim any interest which would be affected by the declaration," and the further provision that non-parties are not to be prejudiced by any declaration made. Minn.Stat. § 555.11. The apparent purpose of section 555.11 is to promote inclusion of all interested parties in a declaratory judgment action. *Miller* contemplates inclusion of claimants under an insurance policy to "prevent a multiplicity of suits." 262 Minn. at 512, 115 N.W.2d at 269. Joining all known claimants, or in this instance allowing a known claimant to intervene, promotes the efficient adjudication of the issues. We conclude that the district court did not abuse its discretion in allowing Diseworth, a known and interested party, to intervene in the declaratory judgment action concerning coverage.

## II.

Westfield next argues that the district court abused its discretion in vacating the default judgment against Wen-

smann. Specifically, it argues that Diseworth failed to demonstrate a reasonable prospect for success on the merits.

■ The district court may relieve a party from a final judgment or order because of "[m]istake, inadvertence, surprise, or excusable neglect" or "[a]ny other reason justifying relief from the operation of the judgment." Minn. R. Civ. P. 60.02. To qualify for such relief, the moving party must show (1) a reasonable claim on the merits, (2) a reasonable excuse for its failure or neglect to act, (3) due diligence after notice of entry of judgment, and (4) absence of substantial prejudice to the opponent. *Finden v. Klaas,* 268 Minn. 268, 271, 128 N.W.2d 748, 750 (1964). "All four of the *Finden* factors must be satisfied in order to justify relief under the rule." *Nguyen v. State Farm Mut. Auto. Ins. Co.,* 558 N.W.2d 487, 490 (Minn.1997). "[B]ut a weak showing on one [*Finden*] factor may be offset by a strong showing on the others." *Reid v. Strodtman,* 631 N.W.2d 414, 419 (Minn.App.2001). Because the goal of litigation is to reach a resolution of disputes on the merits, "courts should be liberal in opening default judgments." *Taylor v. Steinke,* 295 Minn. 244, 246, 203 N.W.2d 859, 860 (1973). Whether a judgment should be reopened is a matter largely within the discretion of the district court and will not be reversed on appeal absent a clear abuse of discretion. *Kosloski v. Jones,* 295 Minn. 177, 180, 203 N.W.2d 401, 403 (1973).

Westfield's primary argument is that Diseworth did not show a reasonable probability of success on the merits.[4] Here, the issue is whether there is a viable argument that the Westfield policy affords coverage for all or part of the damage alleged by Diseworth. In support of its argument that it had a reasonable probability of success on the merits, Diseworth contended to the district court that Westfield had defended and paid a claim for damage to a neighboring community where Wensmann was the contractor. While its argument to the district court was abridged, we note that Diseworth came into possession of a copy of the Westfield policy only days before the district court heard Westfield's motion to vacate. Diseworth demonstrated that Westfield had issued that CGL policy to Wensmann and that the policy was in force at the time of Diseworth's claimed damage. These facts suffice to support a reasonable contention for coverage under the CGL policy.

Regarding the second and third *Finden* factors, concerning whether Diseworth had a reasonable excuse for delay and whether it acted with due diligence, Diseworth was unaware of the coverage litigation in Scott County at the time of Wensmann's default. A more reasonable and valid excuse for failing to intervene earlier is hard to imagine. Diseworth moved to intervene within two weeks of learning of the default declaratory judgment. Diseworth easily meets the second and third *Finden* factors. Finally, Westfield has not shown any substantial prejudice relating to reopening the default judgment. Attorney fees and other costs of litigation are insufficient to amount to substantial prejudice under this analysis. *See Reardon Office Equip. v. Nelson,* 409 N.W.2d 222, 225 (Minn.App.

4. The cases largely refer to a "reasonable *defense* on the merits" because most of the cases involve efforts by a defendant in default to set aside a default judgment. *See, e.g., Roehrdanz v. Brill,* 682 N.W.2d 626, 632 (Minn.2004); *Nguyen,* 558 N.W.2d at 490; *Northland Temporaries, Inc. v. Turpin,* 744 N.W.2d 398, 402 (Minn.App.2008), *review denied* (Minn. Apr. 29, 2008). Here, the party seeking to set aside the judgment was not in default because it had not originally been made a party. In context, Diseworth's obligation under *Finden* is to demonstrate a reasonable probability of success on the merits.

1987) (holding that "there must be more than the added expense incurred by reason of the default proceedings and defense of the action to show substantial prejudice"). We also note that, to the extent that those costs will be greater by virtue of the vacation of the default judgment, it was Westfield that sought a declaration of noncoverage without including a party Westfield knew to be making claims against its insured. *See* Minn.Stat. § 555.11. The district court did not abuse its discretion in vacating the default judgment under the *Finden* factors.

Finally, Westfield argues that Diseworth failed to submit an affidavit along with its motion to vacate the judgment as required by Minn. Gen. R. Pract. 109.01. But Westfield did not raise this issue before the district court. The issue is therefore waived. *See Thiele v. Stich*, 425 N.W.2d 580, 582–83 (Minn.1988) (explaining that we "consider only those issues that ... were presented [to] and considered by" the district court).

### III.

■ Having considered and rejected Westfield's contentions on cross-appeal that the district court erred in reaching the merits of the coverage issue, we next turn to Diseworth's appeal from the district court's grant of summary judgment in favor of Westfield on the coverage question.

■ "On an appeal from summary judgment, we ask two questions: (1) whether there are any genuine issues of material fact and (2) whether the [district court] erred in [its] application of the law." *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990). The standard of review is de novo. *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 77 (Minn. 2002).

■ A party opposing a motion for summary judgment must do more than present "evidence which merely creates a metaphysical doubt as to a factual issue and which is not sufficiently probative with respect to an essential element of the non-moving party's case to permit reasonable persons to draw different conclusions." *DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn.1997). "A material fact is one which will affect the result or the outcome of the case depending on its resolution." *Musicland Grp., Inc. v. Ceridian Corp.*, 508 N.W.2d 524, 531 (Minn.App.1993), *review denied* (Minn. Jan. 27, 1994). In determining whether the district court properly granted a respondent's summary-judgment motion, we "must view the evidence in the light most favorable to the party against whom judgment was granted." *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn.1993).

■ The application and interpretation of an insurance policy present a question of law, which we review de novo. *Marchio v. W. Nat'l Mut. Ins. Co.*, 747 N.W.2d 376, 379 (Minn.App.2008). "When interpreting an insurance contract, words are to be given their natural and ordinary meaning and any ambiguity regarding coverage is construed in favor of the insured." *Am. Family Ins. Co. v. Walser*, 628 N.W.2d 605, 609 (Minn.2001). "Where an insurer asserts that coverage is precluded by an exclusion, the burden is upon the insurer to establish that the exclusion is applicable." *Ministers Life v. St. Paul Fire & Marine Ins. Co.*, 483 N.W.2d 88, 90 (Minn.App.1992).

The parties dispute whether the claims asserted by Diseworth in the underlying complaint are excluded from coverage by the known loss doctrine. As discussed above, Wensmann was aware of the prospect of at least some of Diseworth's potential claims before April 1, 2007, the effective date of the policy. The known loss

doctrine precludes coverage for claims of which the insured knew prior to the insurance policy issuance date. *Domtar, Inc. v. Niagara Fire Ins. Co.*, 563 N.W.2d 724, 737 (Minn.1997). The doctrine precludes coverage for such losses because, once a loss is known to the insured, there is no risk against which to insure. *Id.* Diseworth argues that, in order for the known loss exclusion to apply, Wensmann must have expected future damage to the property, at or prior to the policy's inception.

In our view, the plain language of the policy governs here. *See Am. Family Mut. Ins. Co. v. Ryan*, 330 N.W.2d 113, 115 (Minn.1983) ("[P]arties are free to contract as they desire, and so long as coverage required by law is not omitted and policy provisions do not contravene applicable statutes, the extent of the insurer's liability is governed by the contract entered into."). The CGL policy does not cover specified losses known to the insured prior to the policy period. That policy language excludes claims if, prior to the policy period, the "insured … knew that [the injury or damage] had occurred in whole or in part." The policy further provides that, if there is a continuation, change, or resumption of "property damage" of which the insured had knowledge prior to the policy period, the insured is deemed to have knowledge at the time the policy took effect. Our analysis separates the damage alleged in Diseworth's underlying complaint into three classes: damage resulting from brick arches constructed without Jones's arch design; damage resulting from brick arches that may have been constructed following Jones's arch design; and damage resulting from water infiltration issues.

All of the units in question had been constructed when Wensmann applied for the Westfield policy. Under the policy language excluding coverage for known "property damage," the relevant inquiry consists of two parts. First, in order for the exclusionary language to apply, there must be damage sufficient to constitute "property damage." Second, Wensmann must have had knowledge of that "property damage," as defined under the policy before the policy's inception. If there was "property damage," and Wensmann knew about the "property damage" before April 1, 2007, then the plain language of the policy excludes coverage for that known "property damage."

It is undisputed that Wensmann was aware of cracked arches before April 1, 2007. Thus the relevant inquiry under the policy language is whether the pre–2007 cracks constituted "the … 'property damage'" at issue in Diseworth's claims against Wensmann. This, in turn, requires an analysis of whether the pre–2007 cracks provided Wensmann with the requisite knowledge of the "property damage" alleged in Diseworth's complaint. To provide that requisite knowledge, the damage as alleged in Diseworth's December 17, 2010 complaint and the pre–2007 cracks must share the same cause. Whether the pre–2007 cracks were "property damage" under the policy is a question of law. Whether the damage alleged in Diseworth's complaint against Wensmann shared the same cause as the pre–2007 cracks, thus giving Wensmann knowledge of the "property damage" is a question of fact. Our review of the district court's grant of summary judgment is to determine whether genuine issues of material fact exist concerning causation.

Westfield has the burden of showing that the damage claimed to be excluded does not fall within the definition of "property damage." *See Home Ins. Co. v. Nat'l Union Fire Ins. of Pittsburgh*, 658 N.W.2d 522, 529 (Minn.2003). Diseworth argues that, as a matter of law, the damage that

was subject to the two prepolicy work orders and the subsequent repairs were merely cosmetic and thus did not amount to property damage under the policy. If these two incidents do not constitute property damage, then the subsequent claimed structural problems were not a continuation of the initial incidents. If they were not a continuation, then Wensmann cannot be deemed to have had prior knowledge of loss or risk of loss under the policy.

Westfield agrees on appeal that, if the damage of which Wensmann was aware prior to the policy period was minor or cosmetic, such damage does not constitute "property damage" under the policy. The policy defines "property damage" as physical damage to tangible property. The policy excludes coverage where, before the policy was issued, the insured knew that the "property damage had occurred in whole or in part." Actual knowledge of the full extent of the injury is not required. The issue is whether the insured "knew of the property damage when it purchased insurance that would otherwise cover the loss." *Domtar*, 563 N.W.2d at 737.

Westfield points to three instances in the record to illustrate that the original defects were indeed structural and indicative of the insured having known of the damage: language used by Houge in conversations with Jones from Encompass, Wensmann paying Encompass to redesign the arches, and ACI's report.

Westfield argues that Wensmann knew of the structural damage, as evidenced by Houge's comments to Jones, the Encompass engineer, in 2005. Houge (as Wensmann's site supervisor) qualifies as an "insured" under the policy language cited above. Thus, if Houge knew of structural issues before April 2007, Wensmann must be deemed to have known of "property damage" before the policy's inception. Diseworth argues in response that the

pre–2007 cracks were minor and that Wensmann knew of no structural issues prior to applying for the April 2007 policy.

In his deposition, Houge stated that he initially contacted Encompass for a new design for the arches because he had concerns with how the arches were being built after seeing cracks in the existing arches. Kent Jones, a structural engineer for Encompass, testified that Houge told him that Wensmann needed a new design because the arches had failed and that there was a "blowout at the arch post." Diseworth does not dispute that these statements were made. Diseworth instead claims that, because Houge addressed the issues and had the cracks repaired, Houge could not have expected future damage. Diseworth's ultimate argument is that, even though Houge knew of the cracks in July 2005, he had no knowledge that the cracks amounted to structural defects in the arches. This argument is unpersuasive. Even if Wensmann was unaware of the extent of the structural damage, the cracks put Wensmann on notice of "property damage" to the arches before it acquired the Westfield CGL policy; and by its terms, that policy excludes claims about which the "insured knew ... in whole or in part." Any attempt to distinguish between the magnitude of the damage in 2005 and the damage alleged in the complaint would add unnecessary confusion to the otherwise unambiguous term "property damage." The clearest, and correct, interpretation of what the policy language excludes is damage resulting from structural defects in construction of which Wensmann was aware prior to April 1, 2007.

Per Houge's request, Jones examined five units and provided Wensmann with a design for future arches. Jones opined that there did not seem to have been an original design. Rather, the subcontractors doing the masonry appeared to him to

have installed the bricks as they saw fit. Although Jones could not compare the new design with the subcontractor's method of installing the arches, he asserted that the new design differed from how the original arches were constructed. Jones recommended that the support columns for the arches be steel instead of wood. The record is unclear as to whether Wensmann implemented Jones's design for their future arches, but Houge provided Jones's design plan to the contractors for the last four units built: 880, 882, 960, and 954.

Diseworth hired Advanced Consulting and Inspection (ACI) as its expert in the action against Wensmann. ACI's report found that damage to siding, brick veneer, windows and doors, flashing, attics, caulking/sealing, and masonry veneer arches below the deck structures was structural. Diseworth cannot logically argue both that the arches are a structural defect, yet contend that, for purposes of coverage, the cracks in the masonry work on the arches were simply minor cosmetic issues. There is no question but what there were numerous cracks on different arches prior to April 1, 2007, definitively establishing that there was a problem with the design of the arches (or a lack of any real design) of which Wensmann was aware. The ACI report supports Westfield's argument that the structural problems existed at the time of Encompass's inspection. Thus, as a matter of law, Wensmann had knowledge that "property damage" to at least some of the arches existed before the April 1, 2007 policy took effect.

The district court proceeded on the understanding that the cause of the current damage identified in ACI's 2010 report was the same cause that preexisted the policy. If the pre–2007 cracks and the damage alleged in the complaint against Wensmann *do not* share the same cause, then the current claimed damage cannot be a "continuation, change or resumption" of the pre–2007 damage as required to provide Wensmann knowledge under the policy. If the current damage *does* share the same cause as the pre–2007 damage, then the damage is a continuation and is sufficient to exclude coverage under the policy.

Our careful review of the record reveals no genuine issue of material fact concerning whether the pre–2007 arch cracks were caused by the same structural and construction deficiencies alleged in Diseworth's complaint. Before April 2007, Wensmann was aware of the damage and deficiencies in all units built without the benefit of the Jones arch design. ACI's report identified that the cracks, in positions similar to the pre–2007 cracks, were the result of a flawed design. Because the known loss exclusion, which informs our interpretation of the policy language, does not require actual knowledge of the complete extent of damage, but only knowledge that the "property damage" exists, Wensmann had the requisite knowledge for the exclusion to apply as a matter of law with respect to the arches built without the benefit of the Jones arch design. The pre–2007 cracks in the units not utilizing the Jones arch design are "property damage" within the meaning of the policy, and there is no genuine question of fact concerning whether those cracks share the same cause with the damage alleged in Diseworth's complaint. The district court's order granting summary judgment and declaring noncoverage for the construction of the originally designed arches on units 868, 870, 872, 874, 914, 920, 924, 930, 934, 940, 944, 950, 964, and 970 was therefore proper and is affirmed.

█ Next, we address the second category of damage claims, claims relating to the brick arches with respect to which there are genuine issues of material fact as

to whether the Jones design was implemented. Diseworth argues that, if Wensmann is deemed to have had knowledge of the brick arch defects, that knowledge cannot preclude coverage for all units in the complex. To support this assertion, Diseworth relies on *Wooddale Builders, Inc. v. Maryland Cas. Co.*, 722 N.W.2d 283 (Minn.2006). *Wooddale* is not helpful here. In *Wooddale*, the supreme court discussed allocation of liability to multiple insurers and applied the known loss doctrine separately to trigger coverage on individual homes. 772 N.W.2d at 292–93. Westfield argues that *Wooddale* is inapplicable here because that case involved multiple homeowners who brought suit against the contractor, and the question was how to allocate liability for each claim. Here, Diseworth is the only plaintiff in the Olmstead County action, and it does not allege separate claims for each unit.

Whether Wensmann could have expected future damage from newly designed arches is a different, but relevant, question. Here, Houge testified that he provided Jones's new design to the masonry subcontractors for units 880, 882, 960, and 954. Whether the subcontractors on those units implemented the new design is a genuine issue of material fact. If the new design was implemented, there is a question of fact as to whether all units' cracks share a common cause. In Jones's report, his design recommended using steel rather than wood supports. In ACI's report, Soderland reported that the arches he examined had steel supports. This raises a genuine and material fact issue concerning whether the newer arches incorporated the new design recommended by Jones. If so, a fact-finder might reasonably find that Wensmann did not know of the potential for damage to those four units at the inception of the Westfield policy. The district court therefore erred in granting summary judgment as to all claims of dam-

age to the units' brick arches because there is a question of material fact as to whether the subcontractor implemented Jones's design for units 880, 882, 960, and 954.

■ We now address the third category of damage claims, damage resulting from water infiltration. Diseworth argues that Westfield did not satisfy its burden of eliminating all genuine issues of material fact concerning whether damage from water infiltration was excluded by the policy's known loss language. The only mention of water infiltration having been known or even considered prior to April 1, 2007 is a comment by Herbert Wensmann, the former owner of Wensmann, in his deposition that there "could have been" water infiltration issues. In response to a question about issues at Diseworth from 2004 to 2006, Herbert Wensmann answered, "At Diseworth? I—there could have been some water infiltration problems, and there could have been a deck heave or something. I don't recall. I wasn't—I came down there once a week."

Westfield attempts to compare this appeal to *Dakota Cnty. v. BWBR Architects, Inc.*, where we held that all water leaks should be aggregated into one actionable injury. 645 N.W.2d 487, 492–93 (Minn. App.2002), *review denied* (Minn. Aug. 20, 2002). In *Dakota Cnty.*, the primary issue was whether each of multiple water leaks was separate and distinct for statute-of-limitations purposes. *Id.* at 493. There, we distinguished between aggregating water-infiltration issues for statute-of-limitations purposes and aggregating water infiltration and faulty masonry work for coverage purposes. *Id.* Here, there is a genuine and material fact question concerning whether the cracked brick arches share a cause with the claimed water infiltration.

In *Hyland Hill N. Condo. Ass'n, Inc. v. Hyland Hill Co.*, our supreme court held that the district court did not abuse its discretion when aggregating roof-leaking issues for purposes of applying the statute of limitations. 549 N.W.2d 617, 621 (Minn. 1996), *overruled on other grounds by Vlahos v. R & I Constr. of Bloomington, Inc.*, 676 N.W.2d 672 (Minn.2004). In doing so, our supreme court acknowledged: "While it would not have been unreasonable to distinguish between the different types of defects involved in this case, we do not think that the district court abused its discretion in not doing so." *Id.* Following *Hyland Hill,* and utilizing a de novo standard of review, we conclude that a genuine fact issue exists as to whether the claimed water infiltration damage and the arch defects are distinguishable and discrete items of property damage. To hold that the cracks in an exterior brick arch provided Wensmann with knowledge that there may be water infiltration resulting from improperly installed windows, doors, and siding would greatly expand the universe of potential claims excluded by an insured's awareness of a known loss. There are genuine and material fact issues concerning whether Wensmann had knowledge of water infiltration problems, or even the possibility of such problems, before April 1, 2007. The district court therefore erred in concluding that there is no genuine issue of material fact regarding coverage under the CGL policy for water infiltration claims.

## DECISION

Under Minn. R. Civ. P. 24.01, a district court does not err when it permits a non-party making a claim against an insured under a CGL policy to intervene in an insurer's declaratory judgment action to declare noncoverage under that policy.

Injured parties have an interest in protecting their ability to recover damages in a suit against the insured under the CGL policy sufficient to warrant intervention in the coverage suit.

A default judgment is properly vacated when the party seeking vacation demonstrates the existence of all four *Finden* factors, and the district court did not err in concluding that Diseworth made the necessary showing here.

Summary judgment is appropriate when there exists no material or genuine question of fact as to whether "property damage" was known by the insured prior to the policy period. Summary judgment was properly granted declaring noncoverage for "property damage" relating to the brick arches on units 868, 870, 872, 874, 914, 920, 924, 930, 934, 940, 944, 950, 964, and 970 based upon the absence of any genuine issue of material fact as to whether the insured knew of "property damage" to those arches prior to the policy period. Summary judgment is not appropriate when there exist material and genuine questions of fact about what the insured knew regarding "property damage" at the inception of the policy. Summary judgment was improvidently granted declaring noncoverage for "property damage" relating to the brick arches on units 880, 882, 960, and 954, and for "property damage" relating to water infiltration on all units.

**Affirmed in part, reversed in part, and remanded.**