*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0113**

Diseworth at Somerby, a Planned Community,
Appellant,

vs.

Western National Mutual Insurance Company,
Respondent.

**Filed August 24, 2015
Affirmed
Reyes, Judge**

Scott County District Court
File No. 70CV142675

Douglas A. Boese, Hilary R. Stonelake-Curtis, Dunlap & Seeger, P.A., Rochester, Minnesota (for appellants)

James T. Martin, Gislason, Martin, Varpness & Janes, P.A., Edina, Minnesota (for respondent)

Considered and decided by Larkin, Presiding Judge; Schellhas, Judge; and Reyes, Judge.

**U N P U B L I S H E D   O P I N I O N**

**REYES**, Judge

In an appeal following an award for summary judgment in this declaratory-judgment action, appellant seeks to recover on its *Miller-Shugart* settlement of the

underlying lawsuit against the insured for negligent design, contending that the insured's policy covered negligent design services. We affirm.

## FACTS

### *The Somerby Project and the Wensmann Companies*

Herbert Wensmann is the owner and CEO of Wensmann Homes, Inc (Homes). Homes had offices in Eagan and was in the business of building single and multi-family residential buildings around the greater Twin Cities area. From 2001 through 2007, respondent Western National Mutual Insurance Company insured Homes pursuant to a commercial general liability (CGL) policy. Respondent also provided insurance to other Wensmann affiliates, including Wensmann Realty, Inc., Wensco, Inc., Wensmann Properties, Inc., Wensmann, Management Co., and to Herbert and Elaine Wensmann individually.

In 2001, Herbert Wensmann undertook a project to build residential homes around a golf course in Byron. The residences were titled the Somerby Golf Community and were built in three phases, one of which called for the construction of the appellant Diseworth at Somerby community. The Diseworth community was to consist of 18 luxury townhomes to be constructed between 2003 and 2008. In anticipation of this project, Herbert Wensmann formed the subchapter S corporation Wensmann Homes of Rochester, Inc. (Rochester) in 2002.[1] Rochester was owned by Wensmann Holding Company, Inc., which also owned the other Wensmann entities insured by respondent. Wensmann Holding Company, Inc. and Rochester were not named insureds by

---

[1] Rochester was later renamed "Wensmann, Inc." in 2006.

respondent. Rochester served as the general contractor on the project and was responsible for designing, developing, and constructing the Diseworth community.

The parties dispute the relationship between Homes and Rochester. Diseworth contends that the Wensmann entities are all "legal fictions" created and controlled by Herbert Wensmann, and that they all qualify as "insureds" under the CGL policy. Appellant points out that the plans used for the Diseworth community were modified versions of plans which Homes used for a development in the Twin Cities. The Diseworth plans were drawn by Jack Schilling and Sean Miklich, two draftsmen employed by Homes and working directly under Homes's in-house architect Per Dahlstrom. Terry Wensmann, Herbert's son and vice president of Homes, was also involved in the floor plan layout of the Diseworth homes and would travel to Byron on occasion to oversee the project. Tom Sands, a Homes employee, was sent to Byron as a construction manager charged with hiring supervisors who would oversee all phases of construction of the specific units. He was eventually replaced by Steve Wensmann, another of Herbert's sons. Steve Wensmann was employed by Rochester as a project supervisor. Tim Houge, a Rochester employee, also began as an on-site superintendent. The on-site superintendents and supervisors including Tim Houge, reported to the project supervisors including Steve Wensmann, who in turn reported to Terry Wensmann. Appellant contends that these interrelations show that Homes and Rochester were not two separate entities but rather part of a larger Wensmann family of companies, all of which were insured by respondent.

Contrary to appellant's assertions, respondent contends that Homes and Rochester operated as two separate legal entities. Respondent notes that Rochester had a separate office in Byron with its own employees and its own accounting and payroll records. Rochester, not Homes, filed a "Declaration for Planned Community: Diseworth at Somerby" with Olmsted county on September 11, 2002. That document named Rochester as the project owner. Respondent admits, however, that the building permit filed with Byron identifies Homes as the owner of the project. Respondent claims that this was a mistake and maintains that Rochester was at all times the owner, developer, and general contractor.

*The Policy*

The CGL policy contained an agreement that respondent would defend and indemnify the insured for any amount the insured might be legally obligated to pay on account of "property damage" resulting from an "occurrence" during the policy period, subject to applicable policy definitions and exclusions.

*Construction Problems*

The first unit at the Diseworth community was completed in June 2003 and construction for the remaining units continued until December 2006. One feature of the Diseworth townhomes was brick arches located under a unit's back deck. Rochester hired two subcontractors to construct these arches. Although there were drawings of these arches in the original plan prepared by Schilling and Miklich, no detailed specifications were provided and the subcontracted masons did the work based on their previous experience working with the Wensmann affiliates. Another feature of the

4

Diseworth homes was a large window overlooking the golf course. The size and configuration of the window were determined by the Homes draftsmen, Schilling and Miklich. The performance standards of the windows were determined by representatives from Andersen Windows.

Beginning in 2005, Rochester was made aware that some of the brick arches were failing. The masonry subcontractors performed repair work on the arches of two units, and the bill was charged to Rochester. After being notified of the work request on the arches, Tim Houge hired Kent Jones, a structural engineer with Encompass, Inc. (Encompass) to create a design plan for future arches. Jones observed that the arches were getting cracks where the arch met the post.

In 2005, one of the units also complained of water infiltration that required further repair work. Beginning April 1, 2007, respondent ceased coverage and Westfield Insurance Company (Westfield) took over as the insurer. In 2008, the Wensmann companies went out of business and Rochester turned over control of maintenance to appellant. Between 2010 and 2012, appellant continued to notice problems with the arches and Encompass was again called to the Diseworth homes. While on site, Encompass discovered that the water infiltration problem was more extensive than previously thought. Further investigation revealed that the water infiltration was likely due to faulty windows. A consultant recommended substantial remediation work for all of the units with cost estimates of more than $50,000 per residence.

*Procedural History*

In September 2010, appellant wrote Herbert Wensmann informing him of claims against Rochester and advising him that he should notify his insurers. Appellant presented a settlement demand to Rochester's insurers, respondent and Westfield. Neither insurer agreed to the demand and appellant sued Rochester in December 2010. After initially defending Rochester during the pendency of its own investigation, respondent determined that appellant's claims were outside the scope of respondent's coverage and withdrew from defending Rochester.

Westfield continued to defend Rochester and in October 2011, Westfield moved for declaratory relief based on the theory that Westfield's policy did not provide coverage for damage that Rochester knew about at the inception of its policy on April 1, 2007. Westfield was granted summary judgment and we affirmed for all units built before Encompass created plans for the brick arches. *See Westfield Ins. Co. v. Wensmann, Inc.*, 840 N.W.2d 438 (Minn. App. 2013), *review denied* (Minn. Feb. 26, 2014).[2] During this litigation, appellant filed an amended complaint adding a claim against Homes for negligent design. The amended complaint was filed May 28, 2013 and a copy was forwarded to respondent, who responded that there was no coverage for the new claim made against Homes.

---

[2] We remanded a portion of this case upon a determination that there were factual questions concerning whether a portion of the loss claimed by appellant was known to Rochester prior to inception of the Westfield policy. Soon after, appellant settled with Westfield for $225,000.

6

At the time the amended complaint was filed, both Rochester and Homes were judgment-proof and without assets. Prior to trial, appellant, Rochester, and Homes entered into *Miller v. Shugart* settlement negotiations.[3] These negotiations were successful, and appellant obtained a $750,000 judgment against Rochester and a $1,500,000 judgment against Homes. These settlements were conditioned upon appellant's promise not to enforce the judgments against Rochester and Homes except to the extent of liability insurance coverage. The parties' stipulated settlement recited that Homes had denied liability with respect to the claims being made against it.

Appellant commenced this declaratory judgment action against respondent, seeking declarations that the policy covered negligent design services and that respondent is obligated to satisfy the judgment against Homes. Respondent brought a summary judgment motion claiming its policy does not provide coverage for the claim. The district court granted respondent's motion and this appeal followed.

## D E C I S I O N

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. On appeal from summary judgment, this court reviews de novo whether there are any genuine issues of material fact and whether the district court erred in its application of the law. *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 77 (Minn. 2002).

---

[3] Diseworth also reached numerous settlements with subcontractors, totaling $399,250.

"Interpretation of an insurance policy is a question of law that [this court] review[s] de novo." *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 894 (Minn. 2006). "If the language of an insurance contract is unambiguous, it must be given its plain and ordinary meaning." *Id.* "Coverage provisions are construed according to the expectations of the insured." *Id.* "While the insured bears the initial burden of demonstrating coverage, the insurer carries the burden of establishing the applicability of exclusions." *Id.* "Insurance contract exclusions are construed narrowly against the insurer, and, like coverage, in accordance with the expectations of the insured." *Id.* (citation omitted).

Where, as here, both the scope of an insurance policy's coverage and the enforceability of a *Miller-Shugart* judgment are at issue, we analyze the former prior to the latter. "If there is found to be no coverage for the *Miller-Shugart* judgment, that ends the matter; there is no recovery against the insurer and the reasonableness of the settlement becomes a moot issue." *Alton M. Johnson Co. v. M.A.I. Co.*, 463 N.W.2d 277, 279 (Minn. 1990). Accordingly, we first decide the issue of whether respondent's policy covers the repair costs to the Diseworth homes.

**I.     The district court did not err in ruling that no genuine issue of material fact exists with regard to the policy's coverage.**

The district court determined that respondent was entitled to summary judgment because appellant did not show that the damages incurred are covered under the liability policy. Appellant contests this conclusion, arguing that coverage is provided through the policy's "Design Services Liability" endorsement.

8

**A.** **"Design Services Liability Coverage" endorsement**

The policy contains an endorsement entitled "Design Services Liability Coverage," which states:

> The Commercial General Liability Coverage Part shall apply to claims arising from the architectural engineering or drafting services *provided by the insured or the insured's employees* including:
> > (a) the preparation or approval of maps, plans, opinions, reports, surveys, designs or specifications; and
> > (b)  supervisory, inspection or engineering services.
>
> This coverage applies if such services are provided only for work *contracted for or completed by the insured or the insured's employees*.

(Emphasis added). Appellant argues that the damaged arches and water intrusion problems all arose from the plans and specifications provided by Homes, which qualify as "drafting services" and are thereby covered under this provision. From appellant's view, the designs and specifications were drafted by Homes employees and then used by Rochester employees to build the Diseworth homes. And because appellant assumes that the policy names Wensmann Holding Company as an insured, appellant argues that Homes and Rochester also both qualify as insureds. Appellant then reasons that the claims arose from drafting services done by an insured (Homes) and were provided for work completed by an insured (Rochester), and thus coverage applies. We disagree with appellant's interpretation.

First, Homes and Rochester were not part of the same entity. Rochester was a separately formed corporation and had separate headquarters in Byron. Rochester had

9

separate employees and its own accounting and payroll records. Second, the record contradicts a critical assertion by appellant. Appellant claims that respondent's policy names all Wensmann entities as insureds. However, the policy only lists Wensmann Homes, Inc., Wensmann Realty, Inc., Wensco, Inc., Wensmann Properties, Inc., Wensmann, Management Co., and Herbert and Elaine Wensmann. Notably absent is Wensmann Holding Company as well as Rochester.[4] Accordingly, because Rochester is neither directly listed nor insured indirectly through its owner, the Wensmann Holding Company, it cannot qualify as an insured. Therefore, the design services provision does not apply because the drafting services were not performed for work "completed by [an] insured."

Second, even if we were to assume that Rochester and Homes were both insureds, appellant's argument still fails because appellant has not shown how the insured's negligent designs caused the damaged arches and water infiltration. Typically, an issue of causation is "usually a question of fact and seldom can be disposed of on a motion for summary judgment." *Hamilton v. Indep. Sch. Dist. No. 114*, 355 N.W.2d 182, 184 (Minn. App. 1984); *see also Ill. Farmers Ins. Co. v. Tapemark Co.*, 273 N.W.2d 630, 633-34 (Minn. 1978). However, summary judgment may be appropriate "when the record reflects a complete lack of proof" on an essential element, including causation. *Louis v. Louis*, 636 N.W.2d 314, 318 (Minn. 2001).

Here, the actual "plans" appellant references consist of a two-page site plan providing a legal description of the area, one page of elevation drawings, five pages of

---

[4] Appellant's counsel conceded as much during oral arguments.

floor plans, two cross-sections, and two pages of wall details. But none of these materials contained any specifications or details regarding the brick arches or the windows. In fact, the deposition testimony suggests that these documents were entirely unhelpful to the masonry subcontractors who simply relied on past experience in constructing the arches. Furthermore, an engineering firm later determined that the limited specifications meant that the masonry subcontractors must have employed a "design/build" approach, which resulted in a failure to recognize that the brick veneer at the arch spans had no structural member to support the bricks. With regard to the windows, appellant claims that the size configuration and performance standards were completed by Homes's draftsmen and ultimately selected by Herbert Wensmann. But again, the deposition testimony appellant relies upon appears to stand for the opposite notion. Terry Wensmann testified that the size of window selected is usually done by a draftsman. However, he specifically stated that the performance specifications were all done by Andersen and that Homes would defer to Andersen's expertise for design pressure ratings. And while Terry did posit that his father might have been involved in ordering the windows, he immediately stated that he did not recall who was specifically involved on the Diseworth order. In sum, appellant has failed to provide any concrete evidence that the plans, drawings, and cross-sections provided by Homes caused the specific problems with the arches and windows. Accordingly, summary judgment was appropriate. *See Bob Useldinger & Sons, Inc. v. Hangsleben*, 505 N.W.2d 323, 328 (Minn.1993) (stating "[M]ere speculation, without some concrete evidence, is not enough to avoid summary judgment.").

**B.  Exclusion (l)**

But even if we continue to assume that Homes and Rochester are both insureds, appellant's claims are still precluded from coverage under exclusion (l).  Exclusion (l) of the policy states:

> This insurance does not apply to:
>
> l.  Damage to your work
>
> "Property damage" to "your work" arising out of it or any part of it and included in the "product-completed operations hazard."

"Your work" is defined as "[w]ork or operations performed by [the insured] or on [the insured's] behalf."  The district court relied on this exclusion to conclude that any work that Homes may have done on the Diseworth project is not covered under the policy.

The terms of exclusion (l) preclude coverage.  Appellant briefly argues that the "your work" language of exclusion (l) can only apply to the physical plans drafted by Homes, and since those physical documents were not damaged, the exclusion does not apply.  We disagree.  As discussed supra, appellant argues that both Homes and Rochester are insureds.  But if Rochester is an insured, then construction of the arches and windows certainly qualified as "[w]ork or operations performed by [insured] or on [insured's] behalf" because the construction was in fact done by Rochester or on Rochester's behalf.  Thus, appellant's argument would only be persuasive if Rochester was not an insured.  But if Rochester is not an insured, then the design services liability endorsement would not provide coverage and we need not consider whether the exclusion to coverage applies.

12

In sum, appellant's claims are not covered under the policy, no genuine issues of material fact exist, and the district court did not err in awarding summary judgment. Because we conclude that the claims are not covered, we do not reach the issue of the enforceability of the *Miller v. Shugart* settlement. *See Alton M. Johnson*, 463 N.W.2d at 279 ("If there is found to be no coverage for the *Miller-Shugart* judgment, that ends the matter[.]").

**Affirmed.**